# Richmond.

## CHARLES H. GROETY v. COMMONWEALTH.

### January 18, 1923.

1. INDICTMENTS, INFORMATIONS AND PRESENTMENTS—*Delivery of Indictment in Open Court—Record—Case at Bar.*—No man can be considered as indicted for a felony unless it appears of record that an indictment against him was delivered in open court and the fact recorded. But in the instant case it plainly appeared from the record that a special grand jury returned into court and presented an indictment for murder against the accused, a true bill, and that he was tried on that indictment.

2. DECLARATIONS AND ADMISSIONS—*Criminal Law—Statements of Accused.*— It is always permissible to prove the statements voluntarily made by the accused as to his connection with the crime of which he stands indicted.

3. WITNESSES—*Impeachment—Statements of Accused—Case at Bar.*—In the instant case, a prosecution for homicide, accused had testified in his own behalf, stating in detail how the shooting occurred, and claiming to know nothing about what he had said in the presence of detectives at the time of his arrest. In rebuttal a witness testified that just after the shooting he testified at the office of the detectives that he had no recollection of being at the place of the shooting at the time of the shooting and that he did not know anything about the shooting.

   *Held:* That the rebuttal testimony was proper evidence tending to contradict the accused's testimony.

4. WITNESSES—*Impeachment—Statements of Accused—Waiver of Objections —Case at Bar.*—In the instant case, a prosecution for homicide, where accused testifying in his own behalf had stated in detail how the shooting occurred, testimony of a witness to the effect that accused stated to detectives before the trial that he knew nothing about the shooting was admissible, as accused, having testified in regard to these statements, thereby waived his objection to the testimony of the witness.

5. WITNESSES—*Statements of Accused Before Trial Used to Impeach Him— Instructions that such Statements were to be Regarded Merely as Impeaching Accused—Case at Bar.*—Where accused, in a prosecution for

homicide, testified as to the details of the shooting, evidence in re-
buttal by a witness to the effect that before the trial accused had
said that he knew nothing of the shooting was admissible, where the
court instructed the jury that such witness's evidence could not be
accepted as proving a substantive fact, but merely for the purpose of
impeaching the credibility of the accused.

6. HOMICIDE—*Instructions—Presumption that Homicide is Murder in Second
Degree—Instruction Held Not to Tell the Jury that the Homicide in
Question was Unlawful.*—In a prosecution for homicide the court in-
structed "that every unlawful homicide in Virginia is presumed in
law to be murder in the second degree, and in order to elevate the
offense to murder in the first degree the burden of proof is on the
Commonwealth, and to reduce the offense to manslaughter the bur-
den of proof is on the prisoner." It was urged that this instruction
was erroneous, because it told the jury that the homicide was un-
lawful.

*Held:* That the instruction did not tell the jury that the homicide in
question was unlawful, but simply informs them that every unlawfu
homicide is presumed to be murder in the second degree, and layl
down a principle of law in language which has been approved and aps
plied in this State for more than fifty years.

7. HOMICIDE—*Reasonable Doubt—Instruction as to Presumption of Malice
and Reduction of Offense to Manslaughter.*—Where the evidence is all
in, if the evidence for both the Commonwealth and the accused, re-
gardless of whether his defense be an alibi, or self defense, or what
not, leaves a reasonable doubt as to his guilt, the jury must find the
prisoner not guilty. But where juries have been instructed as to
reasonable doubt, they have given the accused the benefit of that
doubt, notwithstanding what was said in the Commonwealth's in-
structions as to the presumption of malice and the burden of proof
being on the accused to reduce the offense to manslaughter.

8. HOMICIDE—*Voluntary Manslaughter—Evidence Held Sufficient to Support
Conviction—Case at Bar.*—In the instant case accused, deceased and
two companions were drinking together. There was some scuffling
between the other two members of the party, in which accused and
deceased were not engaged. During this scuffling three shots were
fired and deceased fell from his chair. Accused and one of his compan-
ions immediately left the building and the companion asked accused
why he shot deceased. Accused replied that he did not hurt him,
but shot at the floor. Accused then said that he had better get rid
of his pistol and tossed it away. The testimony for the accused did
not materially differ from that of the witnesses for the Common-
wealth.

*Held:* That the evidence was sufficient to support a verdict of volun-
tary manslaughter.

Error to a judgment of the Corporation Court of the city of Norfolk.

*Affirmed.*

The opinion states the case.

*Daniel Coleman,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

WEST, J., delivered the opinion of the court.

This writ of error is to a judgment sentencing Charles H. Groety, the accused, to the pentitentiary for two years for voluntary manslaughter.    He assigns error.

He complains that the record does not show a true bill of indictment was found against him.

[1] It is true that no man can be considered as indicted for a felony unless it appear of record that an indictment against him was delivered in open court and the fact recorded.    *Simmons* v. *Commonwealth,* 89 Va. 156, 15 S. E. 386.    But it plainly appears from the record that a special grand jury returned into court and presented an indictment for murder against Charles H. Groety, a true bill, and that he was tried on that indictment.

This assignment is without merit.

Another assignment of error is the action of the court in admitting testimony of Mrs. R. L. Holland.

Mrs. Holland was a file clerk and shorthand reporter in the Norfolk police department.    The accused had testified in his own behalf in the corporation court, stating in detail how the shooting occurred and claiming to know nothing about what he had said in the pres-

ence of the dectives.    Mrs. Holland was sworn in re-
buttal to prove that just after the shooting he testified
at the office of the detectives that he had no recollection
of being at Jackson's shop at the time of the shooting.
She read to the jury a stenographic report of his evi-
dence showing he stated before the detectives that he
did not know anything about the shooting or throwing
away the pistol after the shooting.    She further testi-
fied that at the time the accused was questioned by the
detectives he was apparently sober and spoke very in-
telligently.

[2-5] It is always permissible to prove the statements
voluntarily made by the accused as to his connection
with the crime of which he stands indicted.    The testi-
mony complained of was proper evidence tending to
contradict his testimony on the trial.    Besides, the ac-
cused having testified in regard to his statements at the
office of the detectives, thereby waived his objection to
the testimony of Mrs. Holland.    *Moore Lumber Corp.*
v. *Walker*, 110 Va. 775, 67 S. E. 374, 19 Ann. Cas. 314.

In addition, the court instructed the jury that Mrs.
Holland's evidence should not be accepted as proving a
substantive fact but merely for the purpose of impeach-
ing the credibility of the accused.

This assignment is likewise without merit.

The accused also contends that the court erred in
giving the jury the following instruction:

[6, 7] "The court instructs the jury that every unlaw-
ful homicide in Virginia is presumed in law to be murder
in second degree, and in order to elevate the offense to
murder in the first degree the burden of proof is on the
Commonwealth, and to reduce the offense to man-
slaughter the burden of proof is on the prisoner."

It is urged that this instruction is erroneous and
calculated to mislead the jury, because it tells them that

the homicide was unlawful and imposes a burden upon the accused to lower the grade of the offense to manslaughter, when, as a matter of fact, the law imposes no such burden upon him.

The instruction does not tell the jury the homicide in question *was* unlawful, but simply informs them that *every* unlawful homicide is *presumed* to be murder in the second degree; and lays down a principle of law in language which has been approved and applied by this court for more than fifty years, without objection or complaint from any person charged with crime.    Observation and experience convince us that its application has worked no hardship upon those accused of murder, for where the juries have been instructed as to reasonable doubt, they have given the accused the benefit of that doubt, notwithstanding what was said in the Commonwealth's instructions as to a presumption of malice and the burden of proof being on the accused to reduce the offense to manslaughter.    When the evidence is all in, if the evidence for both the Commonwealth and the accused, regardless of whether his defense be an alibi, or self-defense, or what not, leaves a reasonable doubt as to his guilt, the jury must find the prisoner not guilty.

The following is a partial list of the cases in which the doctrine has been approved:

*Hill's Case* (1845), 2 Gratt. (43 Va.) 595; *McWhirt's Case*, 3 Gratt. (4 Va.) 594, 46 Am. Dec. 196; *Bristow's Case*, 15 Gratt. (56 Va.) 634; *Honesty's Case*, 81 Va. 282; *Hodges' Case*, 89 Va. 265, 15 S. E. 513; *Horton's Case*, 99 Va. 848, 38 S. E. 184; *Bryan's Case*, 131 Va. 709, 109 S. E. 477; *Jacob's Case* (1922), 132 Va. 681, 111 S. E. 90, and *Sims* v. *Commonwealth*, hereinafter referred to.

In the recent case of *Sims* v. *Commonwealth*, 134 Va.

736, 115 S. E. 382, Judge Burks, speaking for the court, in discussing the same question, said: "This statement of the law is hoary with age  *  *  *  .  When it is said that 'the burden of proof is upon the prisoner' to reduce the offense from murder in the second degree to manslaughter or excusable homicide, all that is meant is that it is incumbent upon the prisoner to introduce sufficient evidence to raise a reasonable doubt in the minds of the jury as to whether the offense is murder in the second degree."

The possibility of injustice to those accused of crime, from the application of this doctrine, is so remote that we are unwilling to overrule a long line of decisions of this court, and decline to hold that the giving of the instruction is error, when, as in the instant case, it is accompanied by a proper instruction on reasonable doubt.

[8] The remaining assignment of error to be considered, is that the court erred in refusing to set aside the verdict as contrary to the law and the evidence.

The accused, in his petition for the writ of error, does not point out in what respect the verdict was contrary to the law and the evidence, or contend that there was no evidence to support it.

The material facts shown in evidence are these:

A. R. Jackson conducted a paper hanging establishment on Bute street in the city of Norfolk.   On August 25, 1920, policeman Green was informed of trouble at Jackson's place and upon arriving there met J. N. Willis, Jr., coming out.   He entered and found no one except Jackson, who was lying on the floor mortally wounded by a pistol shot in the breast, from which he died a few minutes later.

Carl Murray, Alfred Dixon and the accused were partners, conducting an automobile repair business on Dunmore street in Norfolk.   The day of the shooting

these three drank a quart of whiskey and at 5:30 p. m. left their shop in an automobile owned by Murray's brother. Dixon got out of the car at Hopkins "Fish Place" and the accused and Murray proceeded to Jackson's place on Bute street. Murray called and said: "Jack, haven't you got a drink?" and he replied, "haven't you got one?" Murray replied, "I have a quart at my shop," and Jackson said, "Let's go up to the shop."

Murray, Jackson and the accused went immediately to the repair shop where they drank another quart of whiskey, and then returned to Jackson's place. The accused and Jackson went in, while Murray went to carry his brother's car home. Not finding his brother at home, Murray returned to Jackson's place of business and found Jackson, the accused, and J. N. Willis, Jr., in the back room, and all present took another drink. There was some talk about who was a good man and Murray told Willis he thought he could hold him. Willis was seated on the couch near the door when Murray stood over him and put his head under his arm. Just then three pistol shots were fired and when Murray looked around Jackson was falling over a chair at the foot of the desk. As Murray let go his hold on Willis another shot was fired. Murray and Groety left the building immediately and got in Murray's brother's car and drove away. As they drove off Murray asked the accused, "Why did you shoot Jackson," and the accused replied, "I did not hurt him, I shot at the floor." The accused then remarked he had a pistol and had better do away with it, and thereupon tossed it into a lot on Duke street. Shortly after the shooting the accused called at the home of Dixon and told him that Jackson started to hit Murray with a vase and he shot but pointed at the floor, and did not think it hurt

him.   No vase or flower pot was found in the room where the shooting took place.   The pistol was found on the lot on Duke street and had four empty shells and one loaded shell in it.   At the time of the shooting there was no one in the back room except Murray, Willis, Jackson and the accused, all of whom were under the influence of liquor.   There was no pistol on or near the deceased.   A pistol was found in the desk drawer, but had no cartridges in it.

The testimony of the accused as to what transpired prior to the shooting does not materially differ from that of witnesses for the Commonwealth.

The following is the statement of the accused as to what he did just after the shooting:   "I jumped in the car and after I jumped in that car I have no recollection whatever of what happened.   I have a faint recollection of talking to Mr. Dixon and the next thing I remember was my sister coming in my room at home screaming, "Charlie, you shot a man."   Several witnesses for the accused testified that he bore a good reputation for peace, truth and veracity.

A further consideration of the testimony would be unprofitable.   It plainly appears that the judgment is amply supported by the evidence and it must be affirmed.

*Affirmed.*