# Staunton

LYNCHBURG TRACTION AND LIGHT COMPANY, A CORPORATION
v. H. F. WRIGHT, ADMINISTRATOR OF FRED ALLEN WRIGHT.

September 21, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory
and Browning, JJ.

The opinion states the case.

*Barksdale & Abbot* and *J. Wallace Ould,* for the plaintiff in error.

*Caskie, Frost & Coleman* and *J. T. Coleman, Jr.,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

H. F. Wright sued the defendant for damages caused by the death of his intestate and son, Fred Allen Wright, when he was run over and killed by a street car of the defendant on June 8, 1931, at about four o'clock, P. M., on Fort avenue in the city of Lynchburg. There was a verdict and judgment for the plaintiff for $2,500.00

Young Wright was thirteen years and some four months old. He was a well grown youth weighing from 100 to 110 pounds. He was dressed in overalls with long trousers. The evidence shows that he was a normal boy, bright and intelligent. Indeed, he was what is known in the public schools as a five point boy, *i. e.* his weight, height, vision, hearing and teeth were good. His rating in these respects was as high as it can be in the schools. He had had a deal of experience in the doing of the chores and work that a youth of his condition usually does. He went to base-ball games, swimming pools and moving pictures alone and with others and sometimes sold flowers for compensation on the streets of Lynchburg. He lived with his uncle some distance out of the city but went in and out, frequently using the street cars, at will.

Fort avenue is one of the city streets running north and south. Its terminus from the city was past the fair grounds. It is about sixty feet in width and where the accident, presently to be described, happened, the paved part of the street for wheel traffic was twenty-five feet wide with curbs on each side. On the western side of the avenue was located the defendant's single track car

line. It was a part of the street and, of course, ran therewith. On the afternoon in question young Wright was riding on a soft drink truck which was operated by a young man, W. G. Shaner, and his younger brother, a youth some eighteen years of age, was also with them. They had been in the city and were proceeding out Fort avenue south, supplying the trade, and stopped on the avenue, on the paved part near the curb, opposite Floyd Robertson's store, which is west of the defendant's car line. The truck was parked with its rear end about opposite the southern corner of Robertson's store porch. All three of the occupants of the truck went over to the store where W. G. Shaner and Robertson sat on the porch and engaged in conversation while LeRoy Shaner carried a case of empty bottles back to the truck across the defendant's track and Wright, the deceased, went with him. Shaner uncapped a bottle of pop while he was at the truck and in doing so broke the mouth of the bottle and then he placed the bottle back in the case in its place. The deceased borrowed a handkerchief from Shaner to place over the broken bottle for the purpose of drinking the pop. LeRoy Shaner then returned to the store porch and entered into the conversation with his older brother and Robertson, standing near a porch post at or near the southern corner of the porch with his back to the truck and the deceased. Wright was standing on the running board of the truck leaning forward to get the broken bottle of pop. One of the defendant's cars had passed the store going south to the terminus and was proceeding north back to the city on its return trip and as it was approaching the point where the truck was parked Wright turned and stepped from the running board to the curb, thence to the east rail of the track and thence to the middle and as he was in the act of stepping over the western rail the car struck him and its first front wheel passed over his body killing him instantly.

Robertson and the two Shaners saw something of the movements of the deceased and the accident itself as did,

also, the motorman, McGinnis, and a passenger on the car named English.

The truck was parked obliquely to the curb which was next to the eastern rail of the defendant's track. Its front was eight or ten inches from the curb and the rear wheel was placed at one foot from the curb by W. G. Shaner and about three feet by LeRoy Shaner, both plaintiff's witnesses, so that the point on the running board where Wright was standing when he stepped off was considerably less than three feet but more than eight or ten inches. The distance from the curb to the eastern or left-hand rail going out Fort avenue was from two and one-half to three feet and the width of the track, between the rails, was four feet eight and one-half inches. The distance from the outside of the rails across was about five feet and one or two inches. The total distance from the running board, where Wright was standing, across the track was approximately nine feet and two inches.

The evidence for the plaintiff establishes the fact that the motorman rang his bell or sounded his gong for some distance before he reached the point of the accident. The physical conditions showed that he applied sand to the rails at least a car's length from that point. LeRoy Shaner, upon whose testimony the plaintiff most relies, testified that when he heard the bell ringing the car was about at a certain maple tree. It will be noted that the witness did not say that he saw the car at that point but that he heard the bell ringing and that it was about the point where the tree was.

Counsel for the plaintiff insists that the distance from the point of the accident to the tree was sixty-three feet. The evidence does not disclose how this figure is arrived at. DeMott, a witness for the plaintiff, and an engineer, testified that the distance between the maple and the nearest corner of the store porch is fifty-five feet and that the width of the porch is eighteen feet. This, of course, would make the distance from the lower end of the porch to the tree seventy-three feet rather than sixty-three. In this

connection plaintiff's witness, W. G. Shaner, driver of the truck, testified as follows:

"Q. Where, with reference to Robertson's store, did you come to a stop?

"A. The back end stopped about the upper post of his porch."

This being the case the distance from the point of the accident to the tree was materially shorter than fifty-five feet. The contention of the plaintiff is that the motorman could have and should have stopped his car in time to have avoided the accident—in other words, that he had a last clear chance to avoid it. This conception is largely based upon the testimony of the plaintiff's witness, G. A. Witt, who had theretofore for a number of years been an employee of the defendant company, and was something of an expert in operating the type of car in question. He testified that the car should have been stopped in half of its length, which is approximately twenty-one feet, after the brakes had been applied or the emergency apparatus had been put into effect. On cross-examination this witness testified as follows:

"Q. In this case, Mr. Witt, the testimony is that a young boy stepped off a truck approximately five feet from the edge of the car track and walked to the car track and took a couple of steps in it before he came in contact with the street car. In your opinion would it have been possible for a car running at a reasonable rate to have been stopped in order to avoid hitting him after he stepped off the truck?

"A. How far was the street car from the scene?

"Q. Just long enough for the boy to step off the truck and take two or three steps in the middle of the track.

"By Mr. Coleman: That is not the testimony, one witness testified that the car was back at that maple tree which the map shows was sixty-three feet away.

"By the Court: If there is testimony on which to base a hypothetical question he can ask it, and you can ask another one if you wish.

"A. Now what is your question?

"By Mr. Abbot: Q. In your opinion was it a good stop, that is, could a car traveling at a reasonable rate of speed have stopped while the boy was taking three or four steps from the truck?

"A. How far did he travel after it struck the boy?

"Q. That is not my question, I am asking whether it could have been stopped within that period of time, that is, the period of time that it takes a boy to take three or four normal steps.

"A. I really don't think so, that the accident could have been avoided at least in that length of time."

The plaintiff's evidence shows that the boy was struck when he was in the act of raising his foot to step across the second rail of the track into a place of safety. Thus the distance traveled by him from the running board to the said point was about nine feet or three yards, which would require not more than four normal steps. The testimony of the motorman, which is uncontradicted, was that he saw the deceased, when he was about a half a block off, on the truck, in a place of safety and that there was no indication of any intention upon his part to leave the truck or to abandon the place of safety that he occupied.

It is intimated in the plaintiff's brief that the motorman did not slacken or reduce his speed but this is negatived by the testimony of English and McGinnis, the motorman, witnesses for the defendant, on their cross-examination by plaintiff's counsel. Thus English testified that after the motorman rang the bell he gradually checked his speed some, and McGinnis said: "I checked my speed from eighteen to fifteen miles an hour." Upon this point these witnesses had not been interrogated in their examination in chief.

LeRoy Shaner testified, as to the speed of the car, as follows:

"Q. All right, now have you any idea as to what speed the street car was making as it came down Fort avenue?

"A. I would say it was going twenty-five and over, between twenty-five and thirty."

Six other witnesses, with apparently equal or superior opportunity to judge, put the speed of the car between twelve and twenty miles. This includes McGinnis, the motorman, who was put on the stand by the plaintiff and was asked the question of the speed he was making. It is true that plaintiff's counsel asked to be allowed to interrogate him as an adverse witness. There was, however, no court action as to this. The overwhelming testimony was against LeRoy Shaner's version of the rate of speed. We think that the character of this answer rather shows that he was talking at random and that what he said was a pure guess.

As to the testimony of the witness, Witt, that the car should have been stopped in twenty-one feet, he admitted that would have been a perfect stop. The defendant's counsel countered this position by suggesting that it required some length of time to apprehend danger and then to co-ordinate mental and physical processes to the point of the accomplishment of the functions of the variety of means to the desired end. This, we think, is sound and in this connection we quote from the case of *Norfolk Southern Railway Co.* v. *White's Adm'x*, 117 Va. 342, 84 S. E. 646, 647: "If the minds, nerves and muscles of men were so accurately co-ordinated that there could be instantaneous action to meet an emergency, there would perhaps be merit in this case, but as men are actually constituted, in order that the doctrine of the last clear chance may apply, 'it must appear that in contemplation of the entire situation, after the danger of the plaintiff became known to the defendant, or ought to have been discovered by him by the exercise of ordinary care, he negligently failed to do something which he had a clear chance to do to avoid the accident. But the doctrine can have no application where the negligence of both plaintiff and defendant is simultaneous and concurrent.' "

■ We may discard the defendant's evidence and accept the theory of the plaintiff, based on his own evidence, and the conclusion is inescapable that the motorman did all that the law requires of him and, really, all that he possibly could do to avoid the accident. The boy was in a place of safety. He was warned by the appropriate signals of the oncoming car. The time which was required for him to leave such safety zone and get into that of imminent danger was almost inconceivably short. The plaintiff's testimony shows that when the boy was in the middle of the track the car was only eight or ten feet from him. The motorman testified that the boy left the truck when he got within six or seven feet of him. The accuracy of this testimony is emphasized when we take into consideration the distance which was traveled by the boy in reaching the point where he was struck. The plaintiff, however, further suggests that the boy's back was turned to the direction of the coming car. This is not justified by the evidence. At most his side was toward the car and his back was toward Robertson's store.

Further the plaintiff contends that the boy's attention was attracted by the bottle of pop that he had in his hand and that he was drinking or had made some effort to drink. If this is so, he was listless and careless of his own safety and the time in which he was in this state, could it have been known to the motorman, was not sufficient for the avoidance of the catastrophe.

LeRoy Shaner, after testifying that the boy did not jump across the track but took his time and walked across, gave this account of the boy's movements:

"Q. Just stand up here and show the jury how he had the bottle and what he was doing when he stepped across the track?

"A. When he came across this last inside track, he had the bottle like this (indicating).

"Q. When you say 'inside track,' you mean the track over by Robertson's store?

"A. Yes, sir.

"Q. Then what did he do?

"A. He started drinking and raised it up and I *hollered* at him and the fellow hit him.

"Q. Did anybody else *holler* at him?

"A. Mr. Robertson *hollered.*

"Q. What did he do then?

"A. He started to turn his head but he didn't get it around before the car struck him."

After striking the boy the car traveled a distance variously estimated between twenty and forty-two feet. We here note that there was a down grade in the direction the car was moving of from 2.4 to 3 degrees. Of more moment, in our judgment, is the fact that only the first front wheel of the car ran over the boy's body. It was found lying between the first and second front wheels. Viewing the case from the whole testimony, and in all of its aspects, we are of the opinion that the trial court was quite correct in holding that the boy was guilty of contributory negligence as a matter of law. We are not in accord, however, with the ruling of the court to the effect that this case is one which admits of the application of the doctrine of the last clear chance. The whole setting is against it.

The burden was on the plaintiff to show that after the boy got on the track the defendant company had an opportunity to stop the car before striking him but this was not shown. The truth is that there was no primary negligence on the part of the defendant.

In the case of *Washington, etc., Ry.* v. *Thompson,* 136 Va. 597, 118 S. E. 76, 78, the late Chief Justice Prentis said, for the court: "The rule has been repeated in *Hendry* v. *Va. Ry. & P. Co.,* 130 Va. 283, 107 S. E. 715, 716, thus: 'In order to apply that doctrine, the burden is upon the plaintiff, who is confessedly negligent, to prove by a preponderance of the testimony that after his peril became imminent there was a clear opportunity afforded the defendant to save him from the consequences of his own negligence, and this fact must be proved like any

other fact upon which the plaintiff relies.'" *Real Estate, etc., Co.* v. *Gwyn's Adm'x,* 113 Va. 337, 74 S. E. 208; *Norfolk Southern R. Co.* v. *Smith,* 122 Va. 302, 94 S. E. 789, 790; *Gunter's Adm'r* v. *Southern Ry. Co.,* 126 Va. 565, 101 S. E. 885; *Virginia Ry. & P. Co.* v. *Boltz,* 122 Va. 649, 95 S. E. 467; *Virginia Ry. & P. Co.* v. *Harris,* 122 Va. 657, 95 S. E. 403.

It will be noted that the track, from the point of the accident in the direction of the moving car, was straight for a long distance. There was nothing intervening to obscure the vision of either the motorman or the deceased.

■ LeRoy Shaner testified that when the boy was in the middle of the track the car was up at the maple tree. This is clearly an error, whether the tree was distant sixty-three or fifty-five or forty-five feet, unless he stopped on the track, and there is no evidence that he did stop. Shaner's testimony differed materially from that he gave on this point in the police court, two weeks after the accident, when he admits that his recollection was clearer than when testifying in this case. He shifted from one position to another on one of the most crucial points in the case. Plaintiff's counsel urge that this only goes to the credibility of the witness. That, as a question of law, is true but it becomes important in another sense. Shall this court permit a verdict and judgment to stand when it is plainly wrong, being predicated, as it must be, upon the testimony of a witness who is as variable as the wind. Here is applicable the oft-repeated judicial expression "we are not bound to believe the unbelievable."

■ Of course the motorman had no reason to stop his car while the deceased was in a position of safety and security. He was apprised of his abandonment of this haven only when he turned and stepped down from the running board and pursued his short way on to the tracks. The motorman was not required to assume that he would adopt the course which he did and which quickly carried him to his death. *Wright* v. *Atl. Coast*

*Line R. Co.,* 110 Va. 670, 66 S. E. 848, 25 L. R. A. (N. S.) 972, 19 Ann. Cas. 439; *Morton's Ex'r* v. *So. Ry. Co.,* 112 Va. 398, 71 S. E. 561; *Derring's Adm'r* v. *Virginia Ry. & P. Co.,* 122 Va. 517, 95 S. E. 405; *Van Sickler* v. *Wash. & O. D. Ry.,* 142 Va. 857, 128 S. E. 367.

As illuminative of the principles inhering in the doctrine of the last clear chance the Virginia reports teem with cases. We here cite but a few.

In the case of *Norfolk So. Ry. Co.* v. *Smith, supra,* is the following, the late Chief Justice Prentis speaking: "The refusal of the court to grant instruction 'Z,' at the request of the company, is assigned as error. This instruction reads: 'The court instructs the jury that the law recognizes the fact that the nerves and muscles of men are not so co-ordinated that there can be instantaneous action to meet an emergency, and if you believe from the evidence the plaintiff's automobile was suddenly stopped on the track, you cannot find for the plaintiff unless you believe that the plaintiff has proved by the preponderance of the evidence that in contemplation of the entire situation after the danger became known to the motorman or ought to have been discovered by him, by the exercise of ordinary care, he, the motorman, negligently failed to do something which he had a last clear chance to do to avoid the accident.'

"This instruction should have been given in this case. It was peculiarly appropriate in view of the evidence to be hereinafter referred to, and the failure to give it was prejudicial error.

"The doctrine of the last clear chance has nowhere been better stated than in the syllabus to the case of *Roanoke Ry. & Electric Co.* v. *Carroll,* 112 Va. 598, 72 S. E. 125, thus: 'The underlying principle of the doctrine of the "last clear chance," as declared by the decision of this court, is, that notwithstanding the contributory negligence of the plaintiff, there is something in his condition or situation at the time of the injury to admonish the defendant that he is not able to protect himself. The doc-

trine is one of prior and subsequent negligence, or of re-
mote and proximate cause, and presupposes the inter-
vention of an appreciable interval of time between the
prior negligence of the plaintiff and the subsequent negli-
gence of the defendant. Where the negligence of both
continues down to the moment of the accident and con-
tributes to the injury, the case is one of concurring negli-
gence, and there can be no recovery.'

"And again, in *Real Estate Trust & Ins. Co., Inc.* v.
*Gwyn's Adm'x,* 113 Va. 337, 74 S. E. 208: 'In order that the
doctrine of the "last clear chance" may apply, it must ap-
pear that, in contemplation of the entire situation, after
the danger of the plaintiff became known to the defend-
ant, or ought to have been discovered by him by the exer-
cise of ordinary care, he negligently failed to do some-
thing which he had a clear chance to do to avoid the acci-
dent. But the doctrine can have no application to a case
where the negligence of both plaintiff and defendant is
simultaneous and concurrent.' "

In *Barnes* v. *Ashworth,* 154 Va. 218, 153 S. E. 711, 720,
it was said through Justice Epes: "(20) In a case such as
this, if the preponderance of the evidence, viewed as
upon a demurrer to the evidence, fails to show affirma-
tively that there was (not might have been) the lapse of
sufficient time after the rule of the last clear chance be-
came applicable to afford an opportunity for the defend-
ant, in the exercise of ordinary care under all the circum-
stances of the case, to have avoided the injury, the evi-
dence fails to show a clear chance to avoid the injury,
and is insufficient to support a recovery.

"(21) Or if the preponderance of the evidence, so
viewed, fails to show affirmatively, with sufficient defi-
niteness to enable one to put his finger on or to pick out
and specify reasonably definitely, some act, which, after
the doctrine of the last clear chance became applicable,
the defendant did or did not do, which, in exercise of
reasonable care viewed from the standpoint of one stand-
ing in the then shoes of the defendant, he could and ought

to have done or omitted to do, which if done or omitted would have avoided the injury, it is insufficient to sustain a verdict predicated upon the doctrine of the last clear chance." See, also, *Paytes* v. *Davis,* 156 Va. 229, 157 S. E. 557; *Green* v. *Ruffin,* 141 Va. 628, 125 S. E. 742, 127 S. E. 486.

It follows that we reverse the judgment of the trial court and enter judgment for the defendant company.

*Reversed and judgment.*