# Richmond

ROSA SMITH v. COMMONWEALTH OF VIRGINIA.

March 11, 1937.

Present, Campbell, C. J., and Holt, Hudgins, Gregory,
Eggleston and Spratley, JJ.

The opinion states the case.

*R. O. Crockett,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Ralph H. Ferrell, Jr.,* and *Joseph L. Kelly, Jr., Special Assistants,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

Mrs. Rhoda Hankins was killed at her home in a little settlement on Dry Fork, in Tazewell county, on December

7, 1935, at about six o'clock in the morning, then dark. Some one with a shotgun shot through her window and killed her almost instantly as she stood by a stove in the kitchen. For that murder Mrs. Rosa Smith was indicted. She has been tried, found guilty of murder in the second decree and sentenced to twenty years in the State penitentiary.

Mrs. Hankins and her husband, Earl Hankins, were tenants of William Smith, husband of the defendant. Their homes were about a hundred yards apart. The Smith house has in it four rooms; a kitchen and two bedrooms in a row, and on it an L, with another bedroom. On that night, in the room adjoining the kitchen, slept Nancy Smith, age 16, Opal Smith, age 15, children of the defendant, and Robert Crockett, her father. In the corner room were Mrs. Smith, her husband, and three children; Edna, age 12, Becky, age 10, and Albert, age 5. Three children slept in the other bedroom; Lillian, age 22, Claude, age 20, and Ruby, age 18. These bedrooms opened into each other.

This shotgun was loaded with number six shot. Some of the cartridge wadding was found in the kitchen where decedent stood.

The defendant, by way of defense, relied upon an alibi.

There are a number of assignments of error. Those to which we attach most importance appear in certificates of exception numbered 9 and 10. They read:

### CERTIFICATE No. 9.

"After John L. Sparks, Jr., had testified, as shown in the evidence in this case, commencing on page 176 and ending on page 177, the defendant, by counsel, moved the court to instruct the jury that the statement of Claude Smith, as detailed therein, wherein Claude Smith is alleged to have said: 'Somebody played hell up there on the hill. I saved her hull by burning the shell.'

was given in evidence only to impeach the credibility of Claude Smith, and was not evidence of any fact touching the issue to be tried, which motion was resisted by the Common-

wealth, and was overruled by the court, and the defendant excepted."

CERTIFICATE No. 10.

"After the witness, Mrs. Paul Pruett, had testified, as shown in the record in this case, commencing on page 189, wherein the following questions were asked and answers given:

" 'Q. Did Ruby Smith tell you that she and her sister, Lillian, had started over to Otis Booth's the night before the shooting, and that they decided they had better not go, as she felt that there was something awful going to happen?

" 'A. Yes, that is what she said.

" 'Q. And did she also tell you that she took the shells out of the gun and hid them?

" 'A. She did.

" 'Q. State whether or not after this shooting, Ruby Smith, the daughter of the defendant, Mrs. Rosa Smith, told you that on Saturday morning, that is the morning that Mrs. Hankins was killed, when her *dady* started to work, she and her grandfather were sitting by the fire, and when her father went out of the front door, her mother grabbed the gun from the rack and ran in the kitchen with it, and then ran back to the buffet?

" 'A. She did.

" 'Q. Did she also use this language to you: "I would swear she done it in three minutes?"

" 'A. She certainly did.

" 'Q. "She came back with the gun and I was still by the fire?"

" 'A. That was said by Ruby Smith.' "

William Smith and his son, Claude, worked in a coal mine a few miles away from their home. Their evidence is that they were awakened by the defendant fifteen or twenty minutes before six, who was then preparing breakfast for them. This they ate and left for the mine fifteen or twenty minutes after that hour, from which Earl Hankins, or some one for him, summoned them by a 'phone message. They promptly returned and found the defendant working in her home.

The Commonwealth contends that the moving cause of this homicide was jealousy, due to improper attentions paid to

Mrs. Hankins by the husband of the defendant and that the homicide itself was but the consummation of a purpose frequently declared.

Mrs. Paul Pruett was a neighbor. She said that on Tuesday, before the Saturday of the homicide, Rosa came to her house, denounced Rhoda in vile language, and asked for the loan of a pistol. Her statement is "I naturally thought we had always been good friends and I says 'my brother has my pistol,' and she asked me if I could get it for her, and I said 'sure,' and she said, 'Well, if you don't get it for me by Friday, I am going to kill her with a shot gun,' so Saturday morning she was killed." This threat to kill she had heard the defendant make on a number of other occasions. She further tells us that two or three weeks afterwards, in compliance with a request made by the defendant's husband, William Smith, to Paul Pruett, she went to see Rosa, who upon that occasion said to her: "Well, she asked me if I thought it would be best for her to confess and tell everything or if I thought she should let them prove it on her, and I told her she would have to consult a lawyer, that I didn't know anything about it, and after that, it was on Saturday, I think, that Ruby was talking to me."

This witness on cross-examination said that she had not spoken to Mrs. Hankins for some time because of stories which came from Rosa, the substance of which was that the witness' husband, Paul Pruett, had himself been too intimate with Mrs. Hankins and moreover that she herself had on a number of occasions threatened to whip Rhoda if she caught her with her husband Paul.

Mrs. Louise Bandy, a daughter of Mrs. Pruett and a witness for the Commonwealth, testified that she was present and heard Rosa make the threats to which her mother had testified, and that she told her "if she did not get it (pistol) for her by Friday she would kill her with a shot gun." On cross-examination she said that her mother was on bad terms with Mrs. Hankins and had not spoken to her for about a year.

Mrs. Laura Hankins, not a kinswoman of the decedent, also lived at Dry Fork. She heard Rosa charge her husband with

maintaining improper relations with Mrs. Hankins and say she would kill her but for the fact that "the law was on her side, and I didn't want to be taken away from my children." This conversation the witness repeated to her father, John H. Sparks.

Bill Hurd and Mrs. Hannah Frazier, neighbors also, testified that they had heard Mrs. Smith make threats substantially like those already stated.

Mr. Joseph F. Gillespie, a former Commonwealth's attorney, for Tazewell county, at about 8 or 9 o'clock on the morning of the homicide, went to the Hankins home. There Mr. Hankins gave him the shotgun wadding found in the kitchen, on which was stamped number six shot. He also went that morning to the Smith home and saw there a single barrel shotgun loaded with a shell marked number six shot. Its barrel was dirty and smelled of powder.

For the defendant, William Smith (her husband), Robert Crockett (her father), and Lillian Smith, Claude Smith, Nancy Smith, Opal Smith, Ruby Smith and Edna Smith, children, together with the defendant herself, all testified that Mrs. Smith prepared and served breakfast in their home at about six o'clock, in order that her husband and her son, Claude, might reach their work on time.

Without undertaking to discuss this evidence in detail, we may say that it is in substance this: Mrs. Smith was continuously in the house, to the knowledge of these witnesses, for some time before six o'clock and for some time thereafter, and went out only once, then to a smokehouse in the yard for breakfast bacon, which errand took only two or three minutes. In short, if they are to be believed, she was in her home when Mrs. Hankins was killed.

Claude said that the shotgun in the Smith home was his; that he had hunted with it on the preceding Wednesday and had brought back with him one shell which he placed on the buffet. The gun itself was unloaded. Lillian said that she loaded this gun with that shell.

Claude also stated that on this Wednesday's hunt John L. Sparks was with him. This Sparks denied. George

Booth said that it was he who was then hunting with Claude. Without undertaking to state this evidence in greater detail, it is enough to say that the verdict is amply supported, if the Commonwealth's witnesses are to be believed. But if the defendant's witnesses have told the truth, Mrs. Smith was in her home when Mrs. Hankins was killed, and so, of course, is not guilty.

*De mortuis*, but Mrs. Hankins was a disturbing element on Dry Fork. Two married women who have testified believed that she had maintained improper relations with their husbands. Both had threatened her—Mrs. Smith with death and Mrs. Pruett with a whipping. There may have been others.

These suggestions and this conflict in testimony would be entitled to little weight had the jury been properly instructed, for, as we have seen, the evidence for the Commonwealth, though circumstantial, is sufficient. But to reach that conclusion, it had to disregard the flat testimony of nine witnesses, interested though they be. All of this made proper instructions highly important.

██ The same error which is reversible in one case may be unimportant in another. Where the defendant has had one fair trial and where the verdict is plainly right, it should not be disturbed.

In *Virginia Ry. & P. Co.* v. *Smith & Hicks*, 129 Va. 269, 105 S. E. 532, 535, Kelly, P., said:

"The revisers, in section 6331 of the Code of 1919, in keeping with the modern trend of legislative and judicial policy, added a new clause to the old section (Code 1887, section 3449); and the statute now provides that 'no judgment or decree shall be reversed * * * for any error committed on the trial where it plainly appears from the evidence given at the trial that the parties have had a fair trial on the merits, and substantial justice has been done.' It is our purpose to vitalize this provision in its application and administration."

This we have many times reaffirmed in cases both civil and criminal. With it we are in cordial accord.

██ Had Claude Smith not testified and had Ruby Smith not testified, it is plain that the evidence of John L. Sparks,

Jr., and of Mrs. Paul Pruett, as to statements made by these children out of court would have been hearsay and incompetent. The fact that they had testified and that fact alone made it competent; that is to say, it was made competent for the purpose of impeachment and for that purpose alone. It was not substantive testimony to show the guilt of the accused and could not be used to impeach the evidence of other unimpeached witnesses who said that Mrs. Smith was in her home when Mrs. Hankins was shot.

In *Charlton* v. *Unis*, 4 Gratt. (45 Va.) 58, 60, the weight to be given to such testimony is thus stated:

"Such testimony of inconsistent statements is admissible only for the purpose of impeaching the credit of the witness, but cannot be received as evidence of any fact touching the issue to be tried; for that would be to substitute the statements of a witness, generally when not on oath, as evidence between the parties, for his evidence given under the sanction of an oath upon the trial." *New York, P. & N. R. Co.* v. *Kellam's Adm'r*, 83 Va. 851, 3 S. E. 703; *Groety* v. *Commonwealth*, 135 Va. 508, 115 S. E. 561; *Lynchburg Traction & Light Co.* v. *Wright*, 161 Va. 251, 170 S. E. 569.

Shaw, C. J., in *Gould* v. *Norfolk Lead Co.*, 9 Cush. (Mass.) 338, 346, 347, 57 Am. Dec. 50, said:

"It is no evidence whatever that the facts are as he formerly stated them; and, though appeals are sometimes made to a jury that it is so, it is the province of the Court to inform them that it is not so."

See also, *Lydston* v. *Rockingham County Light & Power Co.*, 75 N. H. 23, 70 A. 385, 21 Am. & Eng. Ann. Cases, p. 1236. To that case is appended a comprehensive note in which federal cases and cases from twenty-five States are cited to support this conclusion.

"It is a well-settled rule that prior inconsistent statements of a witness cannot be used on a trial as proof of the facts therein asserted, but are admissible only to impeach the credibility of the witness."

Prof. Wigmore does not give to it his unqualified approval but concedes that it is the orthodox rule. Wigmore on Evi-

dence, vol. 2 (2d Ed.), section 1018. It is the orthodox rule supported by overwhelming authority and long followed in Virginia.

The Commonwealth contends, however, that even if error was committed, it is harmless error and in its brief said:

"It inevitably follows that the jury should conclude from impeachment of the credibility of Ruby and Claude Smith that the other members of the family, who had the same opportunity to observe the actions of the defendant on the morning of the murder, and had told the *same story*, were giving false testimony."

■ Plainly this evidence which tended to impeach the credibility of two witnesses did not impeach the credibility of seven other unimpeached witnesses who had testified as to the whereabouts of Mrs. Smith when Mrs. Hankins was killed. To give that weight to this impeachment would have made it primary evidence on the dominant issue in this case.

We cannot say what inference the jury may have drawn, but it should have been cautioned.

■ The failure of the trial court to give said instructions requested was error, harmful and reversible.

■ Rejected instructions R-1 and R-2 are covered by other instructions. Rejected instruction R-3 told the jury that where two or more persons had the same opportunity and motive to commit the offense and if there is on the whole evidence any reasonable doubt as to which of them committed it, there can be no conviction. It is true that Mrs. Pruett was also jealous. She had *not threatened to kill Mrs.* Hankins but to whip her, and there is no evidence whatever to show that she had any opportunity to kill Mrs. Hankins when she was killed. Both motive and opportunity must appear to make such an instruction proper, and if threats be relied upon, they must be threats to do substantially the same thing.

■ Rejected instruction R-4 told the jury that if any juror had reasonable doubt as to the guilt of the accused, it was his duty not to surrender his conviction merely because

other jurors might be of a different opinion. This was an invitation to hang and should not have been given. *Nelson* v. *Commonwealth*, 153 Va. 909, 150 S. E. 407.

Other errors assigned are without merit.

For reasons stated, this case should be reversed and remanded, and it is so ordered.

*Reversed and remanded.*