# Richmond

WALTER J. CARSON v. COMMONWEALTH OF VIRGINIA.

October 11, 1948.

Record No. 3406.

Present, All the Justices.

400

*Philip M. Flanagan* and *Paul G. Rouse,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Ballard Baker, Special Assistant to the Attorney General,* for the Commonwealth.

HUDGINS, C. J., delivered the opinion of the court.

This writ of error brings under review the proceedings in a trial which resulted in a judgment on a verdict sentencing the accused to 20 years in the penitentiary for murder in the second degree.

The testimony for the Commonwealth may be summarized as follows:

Between 6:30 and 7:00 A. M. on Sunday, August 10, 1947, Esther McCall, a Negro woman, was found dead in the front room of a two-room cottage, occupied by Tom Hazzard, on Myrtle street, in Bristol. The doctor who performed the autopsy said that he found three injuries to the brain, one on the top of the head, another on the back of the skull, and a third on the left side. In his opinion, the injuries were the result of blows inflicted by a flat or round instrument. The doctor also said that even though Esther McCall "had an awfully thick skull," any one of the injuries was sufficient to cause death.

At approximately 5:30 P. M. on August 9, Tom Hazzard and Eugene Brooks returned to Tom Hazzard's home in Bristol from Abingdon with a bottle of gin and several bottles of liquor. They started a drinking bout which continued until after midnight. Between 8 and 9 P. M. Flora Carson, mother of defendant and a friend of Tom Hazzard's, arrived. Shortly thereafter, Esther McCall came in, and around 11 P. M., defendant, who was a special friend of Esther McCall, joined the party. All five of the parties participated in the drinking, though the witnesses

stated that they did not see either Esther McCall or Walter Carson take more than one drink each. Eugene Brooks became "pretty drunk" and went to bed on a cot in the kitchen. After midnight Flora Carson left for her home which was diagonally across the street, 180 feet away. Soon thereafter, Esther McCall and Walter Carson left together. Tom Hazzard stated that he was drunk and went to bed with Brooks in the kitchen. Both Brooks and Hazzard testified that they were not aroused from their drunken slumbers until after the killing.

About 3 A. M., Douglas Delapp and his wife, who live next door to Flora Carson, were awakened by the screams of Esther McCall and the loud voice of the accused cursing and abusing her. The accused was knocking on his mother's front door cursing because she refused to open it. This witness and his wife, watching from their bedroom window, saw the accused beating the girl. Delapp got up from his bed and went outdoors where he remonstrated with Carson for beating the girl and told him, "Walter, you had better quit beating that girl. You are going to kill her the first thing you know." The accused replied, "What have you got to do with it?" To that Delapp said: "I am your friend, and don't want you to get into serious trouble." The accused pulled a knife on the witness who, thereupon, returned to his bedroom. Esther McCall was pleading with the accused and saying, "Walter, please don't kill me." This witness and his wife, from their bedroom window, watched the couple return to Tom Hazzard's house.

Later, Delapp was again awakened by the same noise in the street. His testimony as to what occurred on this occasion is as follows:

"A. Around about 6 o'clock I was awakened again by the noise. The same confusion was still going on.

"Q. And what did you see?

"A. He came out of the house into the highway, he (the defendant) and this girl. He had the girl around the waist and came back to his mother's and knocked again.

and she said, 'I have already told you and I am not letting you in here.' He cursed her two or three times and turned and went back. He got within about 10 feet of the door and the girl pushed him, and when she did that he staggered back into the highway, and when he got himself balanced back he hit her with his fist and her feet flew up, and my wife said, 'he is going to kill that girl,' I said, 'I have already told him, but I won't any more.' In a few minutes his mother came over and asked me if I would go down with her to see if we could quiet Walter. We walked down to the Hazzard house and I meets Walter coming out of the door. I said, 'Walter, this is the second time I have told you about that.' He said, 'I have already killed the God damn bitch.' His mother and I looked around the door and there she laid, her face facing Buckner Street, and her head kind of up in the bed. I walks in and put my hand under her chin and couldn't feel any pulse, and I felt her wrist and saw she was dead. His mother started screaming, and Walter went off toward Moore Street!"

Edna Foster, the aunt of the accused, testified that on Saturday night, from 11 o'clock until a quarter of twelve the defendant and her son worked on an old car after which he called a cab and left. On Sunday morning, August 10, at 6:30, the defendant woke her up kicking and shaking the screen door. When she went to the door, he said: "Lord have mercy, that Esther girl is dead and they will get me for murder." He pulled his shirt off and asked her to burn that shirt. Later he put the shirt in the heater and put on a blue T-shirt, got in a cab, and left. When the police came, she told them what the defendant had said. The police took the bloody shirt and later arrested defendant.

Aaron Hackett and his wife, who lived next door to Tom Hazzard, testified that early in the morning of August 10, they heard a woman crying, heard several licks, and recognized the voice of the defendant cursing and abusing the woman and the woman begging him not to kill her.

This disturbance started about 3 or 3:30 and continued for some time. Aaron testified that after he was awakened by the noise, he remained awake but did not get up until he heard the woman was dead.

Defendant testified that he went to Tom Hazzard's house around 10 o'clock on August 9, stayed there until around 10 minutes past 11. He then went to the home of Tom Foster, the son of Edna Foster, and stayed there until 2:30 A. M., then went to the home of Laura Higgins and spent the night there. He arose about 7 o'clock and was passing Tom Hazzard's house when he saw the door half open. He went in and found Esther McCall lying on the bed. He thought she was asleep. He shook her, and when she didn't move, he picked her up. In doing so, the blood which was oozing from her mouth and nose was smeared on his clothes. This scared him; he dropped her on the bed and went into the back room. There he found Eugene Brooks asleep on the cot and Tom Hazzard sitting in a chair leaning back on the bed. Both of them acted like "they were drunk or something." Tom got up and went in the front room where he sat on a chair opposite the bed where Esther McCall was lying. Defendant went to his mother's. When he got there, he had to knock hard on the door and call in a loud voice to arouse his mother, and this was the noise and confusion which the people in the neighborhood heard. He told his mother that there was something wrong with Esther McCall and went back to Tom Hazzard's with her. When he got there, other people had come; some were screaming and saying, "This girl is dead," and that he had killed her. He got so nervous and scared that he got out and went to his home at Edna Foster's.

The testimony of Laura Higgins, Thomas Foster, and Edna Foster tends to support defendant's attempt to prove an alibi. The issues of fact presented by the conflict of the testimony are sharp and well-defined. The principles of law applicable to these issues are elementary.

Defendant in several assignments of error contends that the evidence for the Commonwealth is insufficient to estab-

lish murder in either degree. This contention is based on
the failure or the inability of the Commonwealth to prove
by direct testimony that the defendant struck the deceased
with a deadly weapon. Two witnesses for the Common-
wealth testified that the blows with which the defendant
struck the deceased were so severe that they heard them
while lying in bed next door. At the same time, they said
they heard the deceased "crying like a baby" and begging
defendant not to kill her. Two other witnesses testified
that defendant hit the deceased so hard with his fist that
her feet flew out from under her. Each of these four
witnesses testified that they heard the accused make numer-
ous threats to kill the deceased while he was beating her,
and at least one witness testified that after the body was
found, the defendant admitted that he had killed her. The
doctor testified that the wound on the left side of the head
might have been sustained when she was knocked down,
but that the blow on the top of the head must have been
caused by being hit with a round or flat instrument and
that a blow with the fist would not likely have caused any
of the three wounds.

The evidence for the Commonwealth tends to prove
that the deceased made little if any effort to resist the
numerous, brutal assaults that the defendant made upon her
between 3 and 6:30 A. M. We said in *Roark v. Common-
wealth*, 182 Va. 244, 28 S. E. (2d) 693, that ordinarily the
fist is not regarded as a deadly weapon and that under ordi-
nary circumstances no malice may be inferred from the use
of the bare fist in striking another. We further held, how-
ever, that an assault with bare fists may be attended with
such circumstances of violence and brutality that an intent
to kill may be presumed. The evidence in this case not
only discloses circumstances of violence and brutality, but
also an expressed intent to kill. In this respect, we find no
error in the action of the trial court in refusing to set aside
the verdict.

It appears that on August 10, soon after the accused was
arrested, the officers asked him to tell them of his move-

ments and activities on Saturday night and Sunday morning. At the same time, they told him that he didn't have to answer the questions and that any statement he made might be used in court against him. In reply the accused stated, among other things, that he started to work on a car at 11 P. M. and continued to work on it until 2 A. M., after which he sat around at Foster's place for 2 or 3 hours. About 4 o'clock he went with his uncle, Tom Laws, to 702 Spencer Street, and from there to Dorothy McDaniel's home on Lily Street. From there he said he was going down town when the officers arrested him. This statement was reduced to writing and signed by defendant who, on cross-examination, acknowledged that he signed it. The objection to the admission of the statement was based on two grounds: (1) that its admissibility should have been determined in the absence of the jury, and (2) that when defendant made it, he was not advised as to his right to be represented by counsel.

The statement is not a confession of guilt, but it is a statement inconsistent with the statements made by defendant while on the stand. Section 4778 of the Code (Michie, 1942) provides that an accused may testify in his own behalf, and if he does, he shall be subject to cross-examination as any other witness. This right to cross-examination implies the right to impeach the credibility of the accused under the same rules applicable to any other witness. *Smith* v. *Commonwealth*, 136 Va. 773, 118 S. E. 107. It appears from the testimony of the officers and the statement itself that the defendant voluntarily answered the questions without threats or promises.

Defendant contends that his written statement, inconsistent with his testimony, should not be admitted because he wasn't represented by counsel at the time the statement was signed. There is no merit in this contention. Mere absence of counsel at a time a confession is made is not sufficient to make it inadmissible. If no force, threats, or promises were made to obtain the confession, and it appears that it was voluntary, then the mere absence of

counsel will not render it inadmissible. A voluntary, inconsistent statement of an accused denying guilt, introduced for the sole purpose of impeachment, is admissible even if the strict rules regarding confessions are applied. *Groety* v. *Commonwealth*, 135 Va. 508, 115 S. E. 561.

Defendant raised no objection to any of the eleven instructions offered by the Commonwealth submitting her theory of the case to the jury. He requested the court to give four instructions, all of which were refused. As a result of this ruling by the trial court, the case was submitted to the jury without a proper instruction on the burden of proof and with no instruction on the presumption of his innocence.

We find no error in the refusal of the court to grant defendant's Instruction A, which reads as follows: "The court instructs the jury that the flight of a person after the commission of a crime raises no presumption of guilt; and if you believe from the evidence that the accused did immediately flee from the scene of the crime, you may take this fact into consideration in determining the guilt or innocence of the accused, which question of flight you may consider, together and with all other facts and circumstances introduced in determining the guilt or innocence of the accused, and the burden is upon the Commonwealth to prove that the accused fled from the scene of the crime with a consciousness of guilt in order for flight to be considered an incriminating circumstance in this case."

The general rule seems to be that an instruction which tells the jury what weight they should give or what inference they should draw from evidence of the flight of the accused from the scene of the crime is an invasion of the province of the jury. The jury may be told that such flight is an element, a circumstance which they may take into consideration along with other facts and circumstances tending to establish guilt or innocence.

We held in the *Anderson Case*, 100 Va. 860, 42 S. E. 865, that: "When a suspected person attempts to escape or evade a threatened prosecution, it may be argued that he

does so from consciousness of guilt; and though the inference is by no means strong enough by itself to warrant a conviction, yet it may become one of a series of circumstances from which guilt may be inferred. An attempt to escape or evade prosecution is not to be regarded as a part of the *res gestae*, but only as a circumstance to be considered by the jury along with the other facts and circumstances tending to establish the guilt of the accused. The nearer, however, to the commission of the crime committed, the more cogent would be the circumstances that the suspected person attempted to escape, or to evade prosecution, but it should be cautiously considered, because it may be attributable to a number of other reasons, than consciousness of guilt."

It was held in *Jenkins* v. *Commonwealth*, 132 Va. 692, 111 S. E. 101, 25 A. L. R. 882, that it was error for the court to instruct the jury that flight after the commission of a crime raised a presumption of guilt. In discussing this point, Judge Kelly, speaking for the Court, said: "The better doctrine, supported by the clear weight of authority, is that such flight as is described in the instruction under review does not measure up to the standard of presumptive evidence of guilt, but is merely evidence tending to show guilt, to be considered by the jury and given such weight as they deem proper in connection with other pertinent and material facts and circumstances in the case." See *Chandler* v. *Commonwealth*, 135 Va. 486, 115 S. E. 703; *Duty* v. *Commonwealth*, 137 Va. 759, 119 S. E. 62; *Bowie* v. *Commonwealth*, 184 Va. 381, 35 S. E. (2d) 345.

The last clause in defendant's Instruction A is an incorrect statement of the law and unduly restricts the jury in the weight to be given proof of flight of the accused from the scene of the crime. The circumstances surrounding the flight after the commission of a crime will vary greatly in different cases. Hence, the better doctrine is for the court to instruct the jury that the flight of the accused, if proven, is evidence to be considered by them and given such weight as they deem proper in connection

with other pertinent material facts and circumstances of the particular case. All facts and circumstances of the flight are pertinent evidence for or against the accused from which the jury may infer what motive prompted the accused in his actions.

One of defendant's assignments of error is the refusal of the court to instruct the jury on involuntary manslaughter. ■ The evidence for the Commonwealth tends to show that if defendant was guilty of any crime, he was guilty of murder. The defense was a total denial of guilt. Defendant denied that he made any assault upon the deceased and his evidence tended to show that he was not at the scene of the crime when it was committed. Hence, there was no evidence which tended to prove manslaughter.

Commonwealth's Instruction No. 8 on murder in the first degree is a stock instruction and was taken practically verbatim from *Horton's Case*, 99 Va. 848, 853, 38 S. E. 184. It reads as follows: "The court further instructs the jury that to constitute a willful, deliberate, and premeditated killing, it is not necessary that the intention to kill should exist any particular length of time prior to the actual killing—it is only necessary that such intention should come into existence for the first time at the time of killing, or any time previously."

This Court has approved the instruction in this form in numerous cases when the evidence tended to establish murder in the first degree. However, it deals with the question of deliberation from the Commonwealth's point of view. It is not unusual when the Commonwealth requests an instruction of this nature, for the defendant to request the court to instruct the jury on the question of deliberation and premeditation from the defendant's point of view. This the defendant did in this case, and the instruction requested reads as follows: "The court instructs the jury that to constitute murder in the first degree the evidence must clearly and distinctly prove beyond all reasonable doubt that the prisoner was not only incited to the killing of the deceased by malice and wickedness of heart, but such

killing must have been a willful, deliberate, and premeditated act on the part of the prisoner; in other words at the time of the killing the prisoner must have distinctly understood what he willed and intended to do; he must have also reflected and deliberated, and premeditated to kill the deceased, or do her serious bodily injury, the probable result of which would be death. And if there is a reasonable doubt whether the prisoner willed, and deliberated, and premeditated that he would kill the deceased, the jury ought not to find the prisoner guilty of murder in the first degree."

The two instructions are not inconsistent and in a proper case both should be given. They simply define deliberation and premeditation from two points of view. *Honesty* v. *Commonwealth*, 81 Va. 283; *Horton's Case, supra*; Virginia and West Virginia Digest, (Michie) Vol. 5, sec. 31, p. 388. It follows that the trial court committed error in refusing to grant the instruction as requested by defendant. It is needless to discuss this question further because, under the statute, the conviction of the defendant of murder in the second degree acquits him of murder in the first degree (Code, section 4918).

Another assignment of error is the refusal of the trial court to grant defendant's Instruction B which reads as follows: "The court instructs the jury that the defendant is presumed to be innocent until his guilt is established by the evidence beyond all reasonable doubt. It is not sufficient that his guilt is probable only, or even more probable than his innocence. Nor can the defendant be convicted upon mere suspicion. No amount of suspicion, however strong, will warrant his conviction. In order to convict the defendant the evidence of guilt must be so strong that there can be no theory from the evidence consistent with his innocence."

This instruction is not skilfully drawn, and does not correctly state the principles of law which the attorney for defendant had in mind when he drew the instruction. The last sentence could easily have been amended so as to read: "In order to convict the defendant the evidence

of guilt must be so strong as to exclude every reasonable hypothesis consistent with his innocence." So amended, the instruction would not have been accurate but would have been unobjectionable.

This was the only instruction tendered by either the Commonwealth or the defendant with the presumption of innocence. We have repeatedly held that every defendant charged with a crime to which he pleads not guilty is presumed to be innocent, and this presumption applies at every stage of the trial until it is rebutted beyond a reasonable doubt by the evidence of the Commonwealth. *Grosso* v. *Commonwealth*, 177 Va. 830, 13 S. E. (2d) 285; *Campbell* v. *Commonwealth*, 162 Va. 818, 828, 174 S. E. 856; *Widgeon* v. *Commonwealth*, 142 Va. 658, 665, 128 S. E. 459.

Considering the instructions as a whole, we find that the trial court failed to instruct the jury adequately either on reasonable doubt or the presumption of innocence. Commonwealth's Instruction No. 10 parenthetically stated that the burden rests with the Commonwealth to make out her case against the accused to the "exclusion of any reasonable doubt," but the dominant principle of the instruction applies, from the Commonwealth's point of view, to that part of the testimony which tends to prove an alibi.

Commonwealth's Instruction No. 11 is an elaboration of the meaning of "reasonable doubt." It is a stock instruction and was copied from *Horton's Case, supra*. Both Instructions 10 and 11, while correct, seem to be predicated on the assumption that the court would give positive instructions on the burden of proof and presumption of innocence. It appears from the record that the trial court failed to instruct the jury properly on principles of law which were applicable to defendant's theory of the case.

The judgment of the trial court is reversed, the verdict of the jury is set aside, and the case is remanded for a new trial to be had in accordance with the views herein expressed.

*Reversed and remanded.*

GREGORY and SPRATLEY, JJ., dissenting.