# Richmond

## C. H. Butler and Calvin Butler v. Estelle Brown Parrocha, et al.

June 9, 1947.

Record No. 3214.

Present, All the Justices.

The opinion states the case.

*Catesby G. Jones, W. M. Minter* and *Lewis Jones,* for the plaintiffs in error.

*Douglas S. Mitchell* and *John Paul Causey,* for the defendants in error.

HUDGINS, J., delivered the opinion of the court.

This is a controversy over a boundary line. The jury rejected the contentions of both parties and by its verdict established a new boundary. From the judgment entered on the verdict, defendants were awarded this writ of error.

The boundary line in dispute is the line defined in the will of John Brim, probated November 23, 1887, dividing his farm between his grandson, John Edgar Broach, and his son, W. L. Brim. The pertinent provisions of this will are:

"Desiring to dispose of what property I have before my death, I will make this my last will.

"I give unto my son W. L. Brim the lot of land upon which he now resides during his life and at his death to be equally divided between his children.

"The said land is adjoining the land of Thomas Key and A. B. Evans. I want the line of said land to commence at the lower end of my farm and to run up on this side of the swamp to a cypress bush and thence up the bottom to a walnut tree and thence up said bottom to the main road.

"I give to my grandson John Edgar Broach all of the balance of my farm upon which I now reside and one yoke of oxen and ox cart and my chamber bed and bedstead and one cow, and the balance of my estate I wish to be equally divided between my children.

"As witness my hand and seal this 26 day of July, 1879.

his

"JOHN     X     BRIM"

cross

The parties will be designated according to the positions they occupied in the trial court. Plaintiffs are now the owners of that part of the John Brim farm devised to John Edgar Broach, and defendants are the owner of that part of said farm devised to W. L. Brim.

The plot, with surveyor's notations, exhibited below defines the boundary of the entire John Brim farm and the boundary line dividing the two tracts devised:

Plaintiffs contended in the trial court that the line designated on the plot A-B-E-H-D was the true boundary between the two tracts. Defendants contended in the trial court, and contend in this court, that the line A-B-C on the plot is the true boundary. The jury rejected both contentions and found the boundary line to be A-B-D. That part of the boundary line from A to B is not in dispute.

Defendants assign the following errors: (1) The action of the trial court in permitting plaintiffs to call and cross-examine John Edgar Broach as an adverse witness under Code, sec. 6214; (2) the refusal of the trial court to admit testimony tending to prove the contents of a lost letter written by Broach to C. H. Butler, one of defendants, defining the boundary line as he understood it; and (3) the refusal of the trial court to set aside the verdict and enter judgment for defendants.

After the controversy over the boundary line had arisen, C. H. Butler, one of defendants, ascertained that J. Edgar Broach, who for more than 35 years had been living in Baltimore, knew the exact location of the line dividing plaintiffs' and defendants' tracts of land. Butler induced Broach to come to Middlesex county and point out this boundary on the ground. After Broach arrived in Middlesex and before he had seen Butler, Mrs. Parrocha, one of plaintiffs, and W. H. Stiff, her surveyor, met Broach, and together they went over part of the boundary line in controversy. During this interview, plaintiffs claim that Broach made certain statements favorable to plaintiffs' theory of the case. Later, Broach went over the entire line with Butler. The attorney for defendants, in his opening statement to the jury, said that he expected to prove by J. Edgar Broach that the true boundary line between the two tracts was as shown on a plot filed as an exhibit with the grounds of defense.

Plaintiffs, before they had introduced any evidence, asked the court's permission to call J. Edgar Broach and cross-examine him as a party "having an adverse interest" under the provisions of Code, sec. 6214.* The ruling of the court,

*Post: Footnote, Acts 1865-6, ch. 21, sec. 4.

granting this permission over the objection of defendants, constitutes the first assignment of error.

The record discloses that in 1920, when Broach sold the tract of land now owned by plaintiffs, he described it as the identical tract devised to him by the will of his grandfather and stated that the land was sold in gross and not by the acre. It thus appears that the witness had no financial interest in the outcome of the trial. He was not related by blood or marriage to any of the litigants—in fact, he seems to have been a stranger to all parties to the action until after this controversy arose.

The decision of the question turns on the application of the provisions of Code 1942 (Michie), secs. 6214 and 6215, as construed by this court.

Sections 6213 and 6214 were originally parts of one act (Acts 1865-6, ch. 21). Section 1 of this act made every litigant a competent witness although having an interest in the outcome of the litigation, and compelled such litigant, if called, to give evidence on behalf of any party to such action, with certain exceptions not pertinent. The same language used in sections 3 and 4* of chapter 21 (Acts 1865-6) was adopted by the Code revisors of 1887 as sections 3350 and 3351, and incorporated by the Code revisors of 1919 in sections 6213 and 6214. It is clear that the intent of the legislature was, first, to compel a litigant, if called by another party to the cause, to testify in behalf of such other party; and, second, to permit any litigant to call and cross-examine any person "having an adverse interest" in the outcome of the litigation, whether or not a party. The only conclusion to be drawn from the language of the act and the context of the words, "having an adverse interest," is that

---

*Sec. 3. "If any party, required by another to testify on his behalf, refuse to testify, it shall be lawful for the court, officer, or person before whom the proceeding is pending, to dismiss the action, suit, or other proceeding of the party so refusing, as to the whole or any part thereof, or to strike out and disregard the plea, answer, or other defense of such party, or any part thereof, as justice may require."

Sec. 4. "A party called to testify for another, having an adverse interest, may be examined by such other party according to the rules applicable to cross examination."

the legislature intended to include, first, a party to the litigation, and, second, a person, though not a party, who had a financial or other personal interest in the outcome. The legislature did not mean to include a party merely because his testimony was or would be adverse to the party calling him. "Adverse interest" was used in its common and accepted meaning and was not used synonymously with "adverse testimony." *Dinger* v. *Friedman*, 279 Pa. 8, 15, 123 A. 641.

Sections 3350 and 3351 were construed in *Ferguson & Co.* v. *Daughtrey*, 94 Va. 308, 315, 26 S. E. 822, where it was held that "where a party seeking to impeach a transaction for fraud, calls as witnesses the parties to the transaction, which, owing to the exigencies of the case, he is obliged to do, and proves by them facts from which the law infers fraud, or which are inconsistent with good faith, and outweigh and overcome their denial of the fraud, effect must be given to the facts so proved and the transaction be annulled."

■ The substance of this holding is that an admission of a party to the cause against his interest is substantive evidence and in the proper case may overcome positive testimony of the same party.

Section 3351 of the Code of 1887 was amended by chapter 117 of the Acts of 1899-1900. The pertinent provision of this amendment was codified by the 1919 Code revisors as section 6215 and is as follows: "A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character, but he may, in case the witness shall in the opinion of the court prove adverse, by leave of the court, prove that he has made at other times a statement inconsistent with his present testimony, but before said last-mentioned proof can be given the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he has made such statement. In every such case the court, if requested by either party, shall instruct the jury not to consider the evidence of such inconsistent statements, except for the purpose of contradicting the witness."

It is to be noted that the words "adverse interest" are not used in this section, but the language is "in case the witness shall in the opinion of the court prove adverse." Here "adverse" is also used as an adjective to describe the word "witness," meaning his testimony. The distinction between "adverse interest" and "adverse testimony" has not always been observed in the cases cited below construing these three sections.

The history of these statutes was reviewed at some length by Judge Keith in *McCue v. Commonwealth*, 103 Va. 870, 49 S. E. 623, and the provisions of the statutes were held to be applicable to criminal as well as civil cases. However, it will be noted that the trial court in *McCue's Case* instructed the jury that the evidence of inconsistent statements made by the son of the accused in that case was admitted for the sole purpose of enabling "the jury to judge whether or not the witness is entitled to credit."

Wigmore criticizes the limitations placed upon these provisions of the statutes and concludes that all limitations on this kind of evidence should be eliminated. III Wigmore on Evidence, 3 Ed., sec. 905.

■ The trend of Virginia decisions is to relax the strict rules of evidence in the interest of developing the whole truth on all issues. The general rule adopted gives great latitude to the discretion of the trial court as to the order in which witnesses may be called and the manner of their examination. The exercise of this discretion will not be disturbed unless it has been abused or substantial harm has been done to the complaining party. See *Yellow Cab Co. v. Eden*, 178 Va. 325, 16 S. E. (2d) 625; *Nelson v. Commonwealth*, 153 Va. 909, 919, 150 S. E. 407; *Pendleton v. Commonwealth*, 131 Va. 676, 109 S. E. 201; *Murphy's Hotel v. Cuddy*, 124 Va. 207, 97 S. E. 794; *Abernathy v. Emporia Mfg. Co.*, 122 Va. 406, 95 S. E. 418; *Green v. Commonwealth*, 122 Va. 862, 868, 94 S. E. 940; *Washington, etc., Ry. v. Jackson*, 117 Va. 636, 85 S. E. 496; *Wickham v. Turpin*, 112 Va. 236, 70 S. E. 514; *Hardy v. Commonwealth*, 110 Va. 910, 927, 67 S. E. 522; *McCue's Case, supra; Gordon v. Funkhouser*, 100 Va. 675, 42 S. E. 677; 10 Va. L. Reg. 849.

The Virginia cases discussing this question may be divided into the following five classes: (1) The witness called was a party to the litigation; (2) the witness had an adverse financial interest in the outcome; (3) the witness was closely connected by blood or otherwise with at least one party, usually the accused; (4) the party who was surprised at the testimony of his own witness asked leave to cross-examine; or (5) there was some additional reason clearly showing that the testimony of the witness was pertinent and highly important in the development of the truth before the jury.

*Pendleton* v. *Commonwealth, supra,* is a typical example of the cases falling within the last named class. Daisy Moss knew the pertinent facts of a homicide. She refused to give the Commonwealth any information. When the case was called for trial, the Commonwealth's attorney stated these facts to the court and asked that Daisy Moss be called as the court's witness and that he be allowed to cross-examine her. The action of the trial court in permitting this to be done was approved by this court.

Plaintiffs knew that Broach was defendants' witness, that he had returned to Middlesex at the special request of defendants, and that he was staying at the home of one of defendants while awaiting the trial of this case. They certainly knew from the opening statement of counsel for defendants that the witness' testimony would be adverse to plaintiffs' theory of the case. They could not claim that they were surprised at the testimony of this witness. It seems that plaintiffs called this witness for the specific purpose of getting before the jury, in the form of impeachment, contradictory statements which they regarded as necessary or essential to the development of their case.

Judge Hutcheson of the United States Circuit Court of Appeals for the Fifth Circuit, in *Young* v. *United States,* 97 F. (2d) 200, 117 A. L. R. 316 at 323, well said: "The rule in its original and strict form against impeaching one's own witness is discredited everywhere, and it is generally recognized that impeachment may be resorted to where a witness

has surprised the party offering him, by his testimony. The overwhelming weight of authority however, supports the rule that though trial courts should, in the exercise of a sound discretion to prevent injury from the surprise testimony of a hostile or corrupt witness, permit cross examination and impeachment by contradictory statements, it is never permitted to make of the rule an artifice by which inadmissible matter may be gotten to a jury through the device of offering a witness, whose testimony is known to be adverse, in order, under the name of impeachment, to get before the jury for its weighing, favorable *ex parte* statements the witness has made."

■ The witness Broach was not a party "having an adverse interest" within the meaning of section 6214. The permission for him to be examined as such witness was erroneous and contrary to the generally accepted practice in this jurisdiction.

Plaintiffs contended that before Broach saw Butler, he made to Mrs. Parrocha and W. H. Stiff statements inconsistent with his testimony regarding the location of the boundary line between the two tracts, and that, after he saw Butler and spent several weeks in his home, he changed his testimony. To meet this situation, defendants offered to prove that Broach, before leaving Baltimore and meeting any of the litigants, wrote a letter to Butler describing the boundary, and that the boundary line so described was the line designated A-B-C on the plot. This letter was lost, but the defendants offered to prove its contents to repel the imputation that the witness had changed his testimony after his association with one of defendants. The refusal of the court to admit proof of the contents of this lost letter constitutes the second assignment of error.

■ ■ The general rule is that declarations of a witness made out of court are not admissible evidence for the purpose of corroborating his testimony in court. One exception to this general rule is that such declarations are admissible to contradict evidence tending to show that a witness' testimony

on the stand is a fabrication of recent date. Under such circumstances, prior consistent statements are admissible if such statements were made at a time when their ultimate effect and operation could not have been foreseen. See *Crowson v. Swan*, 164 Va. 82, 178 S. E. 898; *Repass v. Richmond*, 99 Va. 508, 39 S. E. 160; 20 Am. Jur. 404-5; 28 R. C. L. 655.

This leads to the consideration of the case on its merits. There is no reason to believe that upon another trial any new or additional evidence of any weight would, or could, be introduced. Hence, it becomes the duty of this court, under the provisions of Code, sec. 6365, to enter final judgment. Not only is this true, but on a careful consideration of the whole record we find the evidence is insufficient to support the verdict of the jury.

John Edgar Broach, 85 years of age, testified that, before his grandfather's death, W. L. Brim had taken possession of and was residing on that part of the John Brim farm later devised to him, and that he (Broach) and his grandfather were living on and cultivating the other part of the farm (designated on the plot as the 57-acre tract). Several years before John Brim's death and apparently after the will was written, John Brim established the dividing line between the two tracts. In the presence of his son and grandson, he drove a cedar stob by a little stone at the lower end of the apple orchard and said that the dividing line began there. This corner, the point of beginning, is designated C on the plot. The three went straight from C to a "bunch" of cypress trees—small then, good-sized now—designated B on the plot. John Brim chopped the cypress next to the stream of water as a fore and aft tree. He then went to and chopped a black walnut tree. From there he went to a poplar and thence up the bottom to a point on the Jamaica road designated as point A on the plot.

Before and after this line was established by John Brim, W. L. Brim continued in possession of, paid the taxes on and treated that part of the farm lying north and east of the line A-B-C as his property. On the death of John Brim in 1887,

Broach took complete possession and control of that part of the farm lying south and west of the line A-B-C as his property. He ran a fence around his 3-acre orchard and used it as a pasture. This orchard and pasture lay south of the swamp and west of the line B-C. In 1900 he left the farm, untenanted, and in 1910 he moved to Baltimore. In 1920 he sold his farm to W. L. Byrd and at that time pointed out to him the line A-B-C as the boundary between the Broach tract and the W. L. Brim tract.

Broach testified that in 1945, in response to a letter, he wrote C. H. Butler a description of the dividing line between the two tracts of land. In the fall of 1945, at Butler's request, the witness came from Baltimore to Middlesex county and showed the defendants the dividing line between the two tracts as established by his grandfather, John Brim. The witness had no trouble in finding point A, the stump of the old walnut tree and the cypress at point B, but he could not find the stob or stone that his grandfather had placed at point C. He did find the old orchard and, among the old trees or stumps, a cherry tree around which he had piled bricks when a boy, and he knew that this old cherry tree stood within ten feet of the spot that his grandfather had designated as the beginning of the boundary line. This witness definitely designated this spot as point C on the plot.

Plaintiffs contend that the evidence is in conflict and that the record contains sufficient evidence to sustain the verdict of the jury in finding the boundary line in dispute to be a straight line extending from D to B. To support this contention, plaintiffs rely on contradictory statements made by J. Edgar Broach, fragmentary testimony of other witnesses, the description in the deed from W. L. Brim and his children to defendants' predecessor in title, and the language of the will itself.

Mrs. Parrocha and W. H. Stiff seem to have met Broach on or soon after his arrival in Middlesex county and before he had seen Butler. The three started over the line, beginning at or near point A on the plot, and reached the walnut

stump. Mrs. Parrocha and Stiff testified that when they reached this stump Broach pointed east in the direction of Lewis Brim's house and said that the land south of this house and north of the swamp was his old cow pasture, that the corner of his land was not far from the old roadway near where the old fence crosses the swamp, that he ran a wire fence from the swamp around an orchard to pasture his cow, and that his land was down the swamp a "considerable" distance below his uncle's.

While on the stand, Broach admitted that he went with Mrs. Parrocha and Stiff from point A to a walnut stump shown on the plot, but stated that, when they reached this stump and were looking for the cypress, it was in the late afternoon and the parties, without attempting to go over the other part of the line, left for the night, and that, in accordance with his promise, he returned to the walnut stump the next morning and waited some time for Mrs. Parrocha and Mr. Stiff to appear but (for some reason unknown to him) they failed to keep the appointment. He emphatically denied making any of the alleged statements or any other statement inconsistent with his testimony given under oath. He also said that he never owned or claimed any land down the swamp east or southeast of the line B-C.

Proof of inconsistent statements is admissible only for the purpose of impeachment. It is not received as substantive evidence of any fact on the issue being tried. Otherwise the statements of a witness not under oath would be given the same weight as his testimony upon the trial given under the sanction of an oath. "It is universally maintained by the courts that prior self-contradictions are not to be treated as having any *substantive* or *independent testimonial value*." Wigmore on Ev., 3 Ed., section 1018. This rule has been consistently followed in Virginia. See *Charlton* v. *Unis*, 4 Gratt. (45 Va.) 58; cases cited in *Smith* v. *Commonwealth*, 168 Va. 703, 190 S. E. 91; *Yellow Cab Co.* v. *Eden, supra.*

Contradictory statements made by the witness Broach before he was sworn can only be considered and weighed for

the purpose of discounting his credibility and not as substantive evidence to prove any fact connected with the dividing line.

Maggie Brown, 75 years of age, testified that when she was about eleven years old her father rented the Lewis Brim place for two years; that there was a fence just south of Lewis Brim's house (designated on the plot, the "House Spot"); and that this fence divided that portion of the farm cultivated by Lewis Brim from that portion cultivated by John Brim. She did not know the location of the line between the two places, but that was her understanding of the way the farms were operated. This testimony was confined to a period prior to John Brim's death. It is not clear from the evidence whether she was talking about the relation of the parties before or subsequent to the date on which John Brim established the dividing line. However this may be, the jury rejected her testimony *in toto*, as she was talking about an old fence along which Stiff ran the line D-H.

Mrs. Parrocha stated that in 1935, when she bought the Broach tract from C. D. Moody, he walked with her down the ravine (evidently meaning the southern part of the line A-B), showed her a walnut stump and said that his line went down north of the swamp and that the old apple orchard just south of the line designated H-D was included in the land conveyed to her. The testimony of this witness on the location of the boundary line is vague and indefinite. The substance of it is that Moody, her immediate grantor, told her that he owned land on both sides of the swamp south and east of point B. This testimony is entitled to little, if any, weight in establishing the beginning of the line dividing the two tracts.

In the deed (in defendants' chain of title) from J. W. Street, special commissioner, and the children of W. L. Brim to Thomas Harris, executed in 1902, the W. L. Brim property was described as "bounded north by lands of Abram Key, east by land of Edgar Broach, south by land of Edgar Broach, west by land of Key." Plaintiffs contend that the

only inference to be drawn from this description is that W. L. Brim and his children did not claim any part of the land designated on the map as containing 14.3 acres because the property is described in the Harris deed as bounded "south by land of Edgar Broach."

This contention cannot be sustained because it is conceded by all parties that all the land from the Jamaica road north and east of the W. L. Brim property was formerly known as Key's land and that the Edgar Broach tract lies west or south-west of the Brim tract. Hence, the statement in the deed that the Brim tract is bounded on the east by the lands of Edgar Broach and on the west by the Key land is not true. If this were all the description of the land in the deed, it would be difficult, if not impossible, to locate the tract of land which was intended to be conveyed. Fortunately, other language in the deed—"being all the land devised said W. L. Brimm by the will of John Brimm, near Churchview, containing 60 acres more or less"—gives definite information by which the land can be located on the ground. The error of the scrivener in naming the adjacent landowners east and west of the tract negatives any weight which otherwise might be attached to the language that the land is bounded "south by land of Edgar Broach."

This brings us to the construction of the will of John Brim. He signed his will by a cross mark, thereby indicating that he could neither read nor write. The will was drawn by a layman and not by a person skilled in the use of words to convey his precise meaning. The language used in designating the boundary line of the land devised to the son and grandson is ambiguous. This fact renders the statements of the testator and the surrounding circumstances pertinent to aid the court in arriving at the true intent.

W. H. Stiff, a surveyor employed by plaintiffs, told the jury that he construed the language in the will—"I want the line of said land to commence at the lower end of my farm and to run up on this side of the swamp to a cypress bush"—to mean the lowest point in elevation above the sea on the

farm, at which point he erected a concrete marker. From this point, designated D on the plot, he ran a line across the swamp almost due north to a pine stump and followed the remnants of an old fence, designated on the plot D-H-E-B. There is hardly a scintilla of evidence tending to establish the fact that John Brim intended any part of this line to be a part of the dividing line between the two tracts. The jury were fully justified in rejecting this line as the true boundary between the properties.

There is no other substantive evidence tending to prove that the testator, by the use of the words "lower end of my farm," intended to begin the boundary line at the lowest point in elevation on the farm.

John Brim resided some distance northwest of point B on the tract devised to Broach. The will refers to a bottom sloping south from near Jamaica road to the swamp and indicated on the plot by a meandering line. There is another meandering line just north of point D extending across a part of the John Brim land and then south and southwest of his line to the Jamaica road, designated on the plot "stream through swamp." It is evident that the Broach tract of land slopes to the south and to the east. Several witnesses stated that people going from the Broach home and the Brim house to the public road said that they were going "up", and that going from the residences towards the swamp or the back side of the place they were going "down." Notwithstanding the fact that there is a slight rise or hill beginning at the edge of the swamp and extending south, it would not be unnatural for the parties to refer to the southern boundary as the lower part or lower end of the farm and not thereby intend to designate the lower part or lower end as the lowest point in elevation on the farm.

In determining the spot that the testator intended to designate when he used the words, "commence at the lower end of my farm," weight must be given to other pertinent language in the will. The testator said in his will that he was giving "W. L. Brim the lot of land upon which he (Brim) now resides * * * . The said land is adjoining the land of

Thomas Key and A. B. Evans." It is conceded that at the time the will was written and at the death of John Brim, W. L. Brim was in possession of the eastern part of the John Brim farm. It is also conceded that the Key land bounded the John Brim tract on the north and northeast. (The present owners of the Key land designated on the plot are "E. W. Richardson Est.," "Benjamin Jackson" and "J. H. Walden.") In the surveyor's notes, inscribed on a plot of the Broach tract made by W. H. Stiff, it is stated that the cement marker (designated D on the plot filed with this opinion) is "in the cor. of the old rail fence on the edge of the swamp and south side of the stream, cor. to J. H. Walden, formerly Abraham Key." This evidence was introduced by plaintiffs and it definitely establishes the fact that the Key land bounded the Brim tract on the east and northeast from the Jamaica road down to and across the swamp.

W. H. Stiff also testified that the land of A. B. Evans bounded the Brim tract on the south only a short distance—that is, from point C on the plot to a point 49 feet east of a "dead chestnut," and from that point to point "D" on the plot the land was owned by the Tom Davis estate. Other bits of evidence tend to show that Thomas Davis bought 3.5 acres from A. B. Evans, but this 3.5 acres is not described or definitely located. One side of 3.5 acres would hardly extend 1,037.5 feet, the distance from point D southwest to the point designated "pine" on the plot.

This uncontradicted oral testimony clearly establishes the fact that in order for the W. L. Brim tract to be adjacent to the lands of A. B. Evans, its southern boundary must extend farther southwest than the point designated D on the plot. If the testator intended the tract to be devised to W. L. Brim to adjoin both the lands of Thomas Key and A. B. Evans, then he did not intend "the lower end of my farm" to be the lowest point in elevation above sea level. The designation of point D as the commencement of the dividing line gives no effect to the language of the will naming the adjoining landowners.

The only other objection raised to point C as the beginning

of the dividing line is the language of the will, "and to run up on this side of the swamp to a cypress bush"—"this side" evidently meaning the north side of the swamp. But this objection applies with equal force to the establishment of D as the point of beginning, because D is on the southern side of the swamp and one must cross the swamp in order to get to the cypress bush from either point D or C. The testator evidently meant to say "and to run up to a cypress bush on this side of the swamp." This would have to be construed as the meaning of the language even if there was sufficient evidence to establish D as the "lower end" of the farm.

Broach testified that his grandfather told the scrivener of the will that he desired to make an equal division of his farm between his devisees. The line A-B-C carries this intention into effect.

It is significant to note that every deed in the chain of title conveying either the Broach or the Brim tract states that 60 acres more or less is the quantity of land conveyed. W. L. Byrd owned the Broach tract from 1920 to 1926, during which time he sold the standing timber and informed the man who cut it that his timber did not go east of the line designated on the plot as A-B-C. Byrd sold the land to C. D. Moody, who cut most, if not all, the cord wood, but he did not cut any wood east of the line A-B-C. In 1935, Moody sold the land to Miss Estelle Fisher Brown, who later married Felix Parrocha. It therefore appears that from 1887 until 1935, each of the respective owners recognized the line designated A-B-C on the plot as the dividing line between the two tracts.

The overwhelming weight of the evidence, with no substantial contradictions, clearly reveals that the testator intended to make the line indicated on the plot as A-B-C the dividing line between the tracts of land devised.

The judgment of the trial court is reversed, the verdict of the jury is set aside and final judgment will be entered for defendants.

*Reversed and final judgment.*

BROWNING, J., dissenting.