PRESENT: Carrico, C.J., Compton, Lacy, Hassell, Keenan, and Koontz, JJ., and Stephenson, Senior Justice

CHARLES J. HEGWOOD, ADMINISTRATOR, ETC.

OPINION BY
v. Record No. 972041    SENIOR JUSTICE ROSCOE B. STEPHENSON, JR.
September 18, 1998
VIRGINIA NATURAL GAS, INC.


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Marc Jacobson, Judge


The principal issue in this appeal is whether the trial court erred in striking the plaintiff's evidence. Two other issues involve the trial court's rulings on evidentiary matters.

I

Charles J. Hegwood, Administrator of the estates of four decedents, William E. Dempsey, William E. Staton, Julia M. Dempsey, and Lakeshia Dempsey (the Administrator), instituted separate wrongful death actions against Virginia Natural Gas, Inc. (the Gas Company) and others, seeking damages in the amount of $5,000,000 in each action.[*] The Administrator alleged that the decedents had died as a proximate result of the Gas Company's having exposed them to a fatal level of carbon monoxide gas.

The trial court consolidated the four actions for discovery and trial. The case was tried to a jury, and, at the conclusion of the

---

[*]The other defendants were Suzanne and Dale W. Marshall, Julia Dempsey's landlords, the Norfolk Redevelopment and Housing Authority (the Authority), and the City of Norfolk (the City). Prior to trial,

Administrator's evidence, the trial court struck the evidence and entered final judgment in favor of the Gas Company. We awarded the Administrator this appeal.

II

Julia Dempsey, the tenant, and her two children, Lakeshia, age 15, and William, age five, lived in low-income, federally subsidized housing in the City of Norfolk. William Staton, Julia's friend, also lived with Julia from time to time.

Gas service was initially supplied to the residence in Julia's name in May 1991. The water heater, boiler, and range were gas fired and located in the kitchen. In February 1992, Julia was in arrears in her payments to the Gas Company, and, on February 10, 1992, the Gas Company discontinued its service to the premises by cutting off the supply of gas at the exterior meter, the Gas Company's "delivery point."

On March 11, 1993, after the arrearages had been paid, the Gas Company's service mechanic, Patrick Paul Palumbo, Jr., restored the gas supply. Palumbo removed the exterior meter lock and turned the valve, thereby allowing gas to flow into the house.

Palumbo then checked the gas-fired appliances in the house. He checked the range and determined that it was operating satisfactorily; therefore, he left on the gas supply to the range.

---

the Administrator settled with the Marshalls and the Authority and nonsuited the City.

2

Palumbo, however, discovered that the exhaust from the water heater was not properly venting the combustion gases. The combustion gases were "backdrafting" into the house rather than exiting the house through a vent pipe connected to a chimney. Palumbo knew that a "backdrafting" appliance can form carbon monoxide and create a "life threatening" situation. Therefore, he turned off the gas supply to the water heater at the control valve on the appliance and at the valve on the fuel line leading to it.

When Palumbo checked the boiler, he discovered that it was inoperable due to a defective thermostat. Consequently, Palumbo shut off the gas supply to the boiler at the control valve on the boiler and at the valve on the fuel line leading to it.

Palumbo did not determine the reason the water heater was "backdrafting." He knew that the venting systems for the water heater and the boiler used a common chimney. He also knew that an obstructed or clogged chimney could cause "backdrafting."

Palumbo attached a "red tag" to the shut-off valve on the fuel line leading to the water heater. The red tag stated that "THIS METER OR APPLIANCE MUST NOT BE TURNED ON UNTIL THE CONDITION INDICATED BELOW HAS BEEN CORRECTED." The red tag was left at the premises, and a red tag receipt was kept as a Gas Company record. Palumbo noted on the red tag and on the red tag receipt that the water heater was an "Unsafe appliance" because it was "Backdrafting" and that the gas supply to it had been shut off. He also made a

3

notation on the red tag and the red tag receipt indicating that he had "left off" the boiler due to a "Defective T-stat."  Palumbo had William Staton sign the red tag receipt, and he explained the problems to Staton and directed him not to use the appliances.

Sometime after March 11, 1993, the defective water heater and boiler were turned on by an unidentified person or persons.  On December 12, 1994, all three family members and Staton were found dead in the house, and the house was filled with noxious gas.

According to investigators from the Norfolk Fire Department, there was a heavy and extensive build-up of "soot" or "unburned carbon" on the walls and ceiling of the kitchen as well as in other rooms in the house.  The investigators opined that this condition resulted directly from "backdrafting" caused by incomplete combustion, resulting in unburned carbon drafting back into the house.  The heaviness of the soot deposits indicated that the condition had built up over a "long" time.  The investigators examined the interior of the chimney to which the appliance vents were connected.  They found that there were large collections of fallen bricks, leaves, and debris obstructing the chimney.  According to the investigators, this condition caused both the water heater and boiler to "backdraft."

James V. Powell, Jr., testified as an expert for the Administrator.  Powell is a chemical engineer who had been engaged in the heating and air-conditioning field since 1949.  Powell opined

4

that the blocked chimney caused the "backdrafting" of both appliances that in turn created carbon monoxide as a result of incomplete combustion.

A vice president of the Gas Company, called as an adverse witness by the Administrator, testified that the Gas Company operated under "Terms and Conditions" approved by the State Corporation Commission. These Terms and Conditions included a provision that the Gas Company's customer shall be responsible for the maintenance and repair of the customer's piping, appliances, and equipment on the customer's side of the Gas Company's metering equipment.

### III

The Administrator contends that the trial court erred in excluding certain opinions of his expert, James V. Powell, Jr. The court excluded Powell's opinions that (1) the Gas Company should have cut off the gas supply at the exterior meter, (2) the red tag was inadequate to properly and effectively warn of the dangers, and (3) the obstructed condition of the chimney which existed on December 12, 1994, was the same condition that existed on March 11, 1993, and was the cause of the "backdrafting."

Whether a witness may render an opinion as an expert is a matter that rests within the sound discretion of a trial court. The trial court's ruling will be reversed only where the court has abused its discretion. Brown v. Corbin, 244 Va. 528, 531, 423 S.E.2d 176, 178 (1992); Philip Morris Incorporated v. Emerson, 235 Va. 380, 411, 368

5

S.E.2d 268, 285 (1988); Landis v. Commonwealth, 218 Va. 797, 800, 241 S.E.2d 749, 750-51 (1978).

With respect to Powell's opinion that the Gas Company "should have" discontinued the gas supply at the meter, the trial court observed that this was "simply [Powell's] opinion and [was] not based on his knowledge of industry standards or practices." The record indicates that, although Powell had been in the business of designing, installing, and repairing commercial heating systems, he was not an expert in the utility business and was not conversant with the gas industry's standards or practices. We cannot say, therefore, that the trial court abused its discretion in excluding this opinion.

The Administrator also claims that the trial court erred in excluding Powell's opinion that the boiler should have been red tagged for "backdrafting" by the Gas Company's mechanic, Palumbo. Powell reasoned that Palumbo should have known that, if the water heater were "backdrafting," then the boiler also would have been "backdrafting" because the two appliances were vented into the same chimney. Powell's opinion was based upon an assumption that the condition in the chimney that caused the water heater to "backdraft" on March 11, 1993, also would have caused the boiler to "backdraft" had it been operable. Powell conceded, however, that there were potential causes for the water heater to "backdraft" which would not have caused the boiler to "backdraft." Powell also conceded that

6

Palumbo did not know that the boiler was "backdrafting" because he could not get the boiler to operate due to a defective thermostat.

The trial court observed that there was nothing in the record to support Powell's assumption that the chimney was in the same condition on March 11, 1993, as it was some 20 months later when the decedents' bodies were discovered. The court concluded, therefore, that Powell's opinion was premised upon an insufficient factual basis and was speculative. Again, we cannot say that the trial court abused its discretion in excluding Powell's opinion about Palumbo's failure to red tag the boiler. It follows, therefore, that the trial court also did not abuse its discretion in refusing to allow Powell to opine that, because the chimney was found to have been clogged in December 1994, the chimney was likewise clogged on March 11, 1993. The trial court properly reasoned that such testimony was too speculative to be probative. See Mary Washington Hosp. v. Gibson, 228 Va. 95, 100, 319 S.E.2d 741, 744 (1984).

IV

The Administrator next contends that the trial court erred in refusing to allow his counsel to call and cross-examine as adverse witnesses three Gas Company employees. Pursuant to Code § 8.01-401(A), "[a] party called to testify for another, having an adverse interest, may be examined by such other party according to the rules applicable to cross-examination."

7

Although the statute specifically refers only to a "party," we have held that it permits any litigant to call and cross-examine any person, though not a party litigant, "having an adverse interest." Butler v. Parrocha, 186 Va. 426, 431-32, 43 S.E.2d 1, 4 (1947) (decided under predecessor statute). A person who has a financial or other personal interest in the outcome of the litigation is deemed to have an adverse interest. Id. at 432, 43 S.E.2d at 4. We have not held, however, that, merely because a witness is an employee of a party litigant, the witness is per se adverse. A trial court is given wide discretion in deciding how a witness may be examined, and its decision will not be disturbed on appeal unless the record shows that the court abused its discretion or the complaining party has been substantially harmed. Id. at 433, 43 S.E.2d at 5.

In the present case, the trial court properly ruled that the employees were not per se adverse witnesses. The court indicated to the Administrator's counsel that the witnesses would be examined in the "normal course," unless and until their testimony suggested that they did have adverse interests or they proved to be hostile witnesses. Nothing in the record suggests, nor does the Administrator contend, that any of these witnesses had any adverse interests or were hostile to the Administrator. We cannot say, therefore, that the trial court abused its discretion or that the Administrator has been substantially harmed by the court's ruling.

V

8

Finally, the Administrator contends that the trial court erred in striking his evidence at the conclusion of his case-in-chief. Ordinarily, negligence and proximate cause are issues to be decided by a jury. However, when reasonable minds could not differ about the result, they become issues of law to be decided by a court. Poliquin v. Daniels, 254 Va. 51, 57, 486 S.E.2d 530, 534 (1997).

The Administrator asserted that the Gas Company was negligent in (1) supplying its customer's lines with gas when it had actual knowledge of dangerous defects in the customer's appliances and (2) failing to adequately warn the occupants of the premises of the defects.

Generally, a utility, such as a natural gas company, is not responsible for a dangerous defect in a customer's equipment or appliance beyond the company's delivery point. However, when a company has actual knowledge of a dangerous defect in a customer's equipment or appliance, it has a duty to exercise reasonable care to shut off the service to such equipment or appliance. See VEPCO v. Daniel, 202 Va. 731, 735, 119 S.E.2d 246, 249 (1961) (duty of electric power company). The company also has a duty to warn the occupants of the premises of the known dangerous defect. See Holcombe v. NationsBanc, 248 Va. 445, 447, 450 S.E.2d 158, 159 (1994) (premises liability); Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 134, 413 S.E.2d 630, 634 (1992) (products liability). If

9

the company fails to perform either or both of these duties, it is negligent.

In the present case, the Gas Company's mechanic inspected the customer's appliances before restoring the gas supply. He discovered that the customer's water heater had a dangerous defect, as it was "backdrafting." Consequently, he cut off the gas supply to the water heater at both the control valve on the water heater and at the valve on the fuel line leading to it.

The mechanic also found that the customer's boiler would not operate due to a defective thermostat, a condition that was not necessarily dangerous but that required repair. Therefore, he shut off the gas supply to the boiler at the control valve on the boiler and at the valve on the fuel line leading to it.

The mechanic then attached a red tag to the shut-off valve on the fuel line leading to the water heater. The red tag contained the following warning: "THIS METER OR APPLIANCE MUST NOT BE TURNED ON UNTIL THE CONDITION INDICATED BELOW HAS BEEN CORRECTED." The "condition indicated" on the red tag was that the water heater was an "unsafe appliance" because it was "backdrafting." The red tag also informed the occupants that the gas supply to the water heater had been shut off. The mechanic also noted on the red tag that the boiler was "left off" due to a "Defective T-stat."

10

The mechanic explained the appliances' defects to Staton, one of the adult occupants of the premises. He told Staton not to use the appliances, and Staton signed a receipt for the red tag.

The mechanic also found that the customer's cooking stove was operating properly. Therefore, he left on the gas supply at the meter so that the customer could use the stove.

Sometime thereafter, in spite of the mechanic's warning, someone other than a Gas Company representative turned on the gas supply to the two defective appliances. It is not known whether one or both of the appliances produced the carbon monoxide that caused the fatalities.

The Administrator contends that the Gas Company was negligent in failing to shut off the gas supply at its meter. In rejecting this contention, the trial court observed that, under that standard, a utility would be required to shut off the gas supply to an entire house "any time the company knew a single appliance might be unsafe." The court noted that, "[i]f this occurred during the winter time, the house would be without heat, hot water or any other gas services [to appliances] that were functioning properly." We agree with the trial court.

The Administrator also contends that the Gas Company's warning was inadequate. We do not agree. We think the mechanic's oral and written warnings fully alerted the occupants of the premises of the defects in the appliances.

11

We hold, therefore, that, when the Administrator's evidence and the reasonable inferences deducible therefrom are viewed in the light most favorable to the Administrator, the evidence fails, as a matter of law, to present a <u>prima</u> <u>facie</u> case of negligence by the Gas Company.  It is undisputed that the Gas Company's mechanic, upon discovering the appliances' defects, took appropriate action to shut off the gas supply to the defective appliances and properly warned the occupants of the defects.

Accordingly, we will affirm the trial court's judgment.

<u>Affirmed</u>.