## Alexandria

### JOSEPH FRANCIS O'BRIEN

v.

### COMMONWEALTH OF VIRGINIA

No. 1031-85

Decided May 19, 1987

COUNSEL

John C. Youngs and Brendan Feeley, for appellant.

Thomas C. Daniel, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

MOON, J. — Joseph Francis O'Brien appeals his conviction of first degree murder, alleging: (1) the evidence was insufficient as a matter of law to sustain the conviction; (2) the trial court erred in allowing the Commonwealth to recall a defense witness to lay a foundation for impeachment of that witness; and (3) the trial court erred in denying his request for discovery of alleged exculpatory information concerning a suspect who had committed "similar" crimes. We disagree and affirm the conviction.

When the sufficiency of the evidence is challenged on appeal, "we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom . . . [and] [t]he judgment . . . will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Beck v. Commonwealth*, 2 Va. App. 170, 172, 342 S.E.2d 642, 643 (1986) (citing *Evans v. Commonwealth*, 215 Va. 609, 612-13, 212 S.E.2d 268, 271 (1975); Code § 8.01-680).

The evidence implicating O'Brien, a twenty-five year old male who lived approximately 160 yards from the victim's home, was wholly circumstantial.

"[I]f the proof relied upon by the Commonwealth is wholly circumstantial . . . then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt. To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty. Yet what inferences are to be drawn from proved facts is within the province of the jury and not the court so long as the inferences are reasonable and justified."

*Higginbotham v. Commonwealth*, 216 Va. 349, 352-53, 218 S.E.2d 534, 537 (1975) (quoting *LaPrade v. Commonwealth*, 191 Va. 410, 418, 61 S.E.2d 313, 316 (1950)).

"The Commonwealth's evidence, however, need not affirmatively disprove all theories which might negate the conclusion that the defendant killed . . . the deceased, but the conviction will be sustained if the evidence excludes every reasonable hypothesis of innocence." *Higginbotham*, 216 Va. at 353, 218 S.E.2d at 537.

Evidence presented at trial demonstrated that Betty J. Konopka was stabbed nineteen times in the bedroom of her home and, according to expert testimony, died at approximately 1:00 a.m. on June 6, 1984, plus or minus one hour. The assailant apparently entered the home through the back door by breaking a window pane, reaching through the broken glass, and unlocking the door.

On the evening before the murder, O'Brien had been at Misty's Bar where he claimed he had been in some type of altercation. Officer Harry Foxwell, who knew O'Brien, testified that he saw him that same night after he left the bar and gave him a ride to the intersection of Columbia Pike and Buchanan Street in O'Brien's and Mrs. Konopka's neighborhood. Buchanan Street intersects Pershing Drive, where O'Brien lived, and Pershing Drive intersects Woodrow Street, where Mrs. Konopka lived. Foxwell dropped off O'Brien at 12:38 a.m. Foxwell saw O'Brien walk north on Buchanan Street in the direction of his home and that of Mrs. Konopka. At trial, O'Brien presented evidence that he remained at Misty's Bar until 1:00 a.m. Nevertheless, the officer's testimony was sufficient to show that O'Brien was in her neighborhood at the time of Mrs. Konopka's death, especially in view of the expert testimony regarding the time of death.

When the assailant broke the small window pane in the back door of Mrs. Konopka's home, several jagged pieces of glass remained in the window frame and one in particular subjected the intruder to the possibility of cutting his arm if he reached through it for the lock. O'Brien had a cut on his right forearm at the time of his arrest. A forensic expert testified and demonstrated that O'Brien's cut was located on his arm in the spot where it would have been if O'Brien cut it attempting to unlock the door by reaching through the broken window pane in the victim's home. O'Brien actually gave four different accounts of how he cut his arm. On one occasion, O'Brien told Mark Snider, a physician's assistant, that an assailant stabbed him with a bottle or "pane of glass" outside Misty's Bar. However, a witness to the altercation outside of Misty's Bar testified that O'Brien was not injured in the

scuffle.

Furthermore, Officer Foxwell, who observed O'Brien for approximately twenty minutes before 12:38 a.m., stated that O'Brien had no cuts or blood upon his body. He paid particular attention to O'Brien because O'Brien had complained of having been struck in the head with a bottle. O'Brien also complained of dizziness and Foxwell suggested that O'Brien go to the hospital, but O'Brien refused. Based upon the officer's testimony, the jury could have found that the cut did not occur until after Officer Foxwell dropped off O'Brien on Buchanan Street at 12:38 a.m.; based upon the forensic expert's testimony, the jury also could have found that the cut was consistent with having occurred at the Konopka residence.

The most significant incriminating evidence concerned O'Brien's shoes. O'Brien had a new pair of Stadia tennis shoes that he bought on the morning before the murder. When the intruder broke the window pane, the floor became covered with glass. At trial, a forensic expert testified that less than five percent of all the window pane glass in the United States had the same properties as the glass used in Mrs. Konopka's home. When O'Brien's tennis shoes were seized two days later, forty pieces of glass were removed from them. The expert testified that he analyzed two of the pieces of glass and found that they had the same properties as the glass broken from Mrs. Konopka's window pane and no properties inconsistent with the broken glass.

In addition, O'Brien's tennis shoes used a blue "Velcro" fastener. A piece of blue "Velcro" fiber was found in the carpet of Mrs. Konopka's bedroom. The evidence ruled out the likelihood that anyone else, other than the assailant, had been in the bedroom wearing anything containing blue "Velcro." The expert testified that the "Velcro" found in the victim's bedroom had the same chemical and optical properties as the "Velcro" on O'Brien's tennis shoes.

More significantly, an expert on shoe prints was able to discern several shoe prints on the pieces of glass obtained from the floor of the victim's home. The print was of a Stadia shoe, the ridges of which were so unique that the expert had seen them on only one other pair of shoes in seven years of examining approximately one thousand pair per year. The print on the broken glass was a per-

fect match of O'Brien's new Stadia shoes and could have been made by his shoes. Furthermore, the expert was able to testify that the print on the broken glass was so distinct and clean that it must have come from a "fairly new" shoe, like O'Brien's.

Other circumstantial evidence linking O'Brien to the murder included a hair consistent with O'Brien's hair and inconsistent with the victim's that the police found in the bedding where Mrs. Konopka's body was discovered.

Another circumstance which we believe the jury had the right to consider was O'Brien's struggle when a detective attempted to take a photograph of the puncture wound on O'Brien's arm. It took seven police officers to hold O'Brien still during the examination as he struggled to keep the photograph from being taken. This fact does not prove guilt, but like flight from the scene of the crime, it is a circumstance tending to show guilt which the jury could have considered in weighing the other evidence in the case. *See Carson v. Commonwealth*, 188 Va. 398, 409, 49 S.E.2d 704, 708-09 (1948); *Jenkins v. Commonwealth*, 132 Va. 692, 694-95, 111 S.E. 101, 102 (1922).

O'Brien argues that there was evidence at trial inconsistent with his guilt. For example, he contends that none of his blood was identified as being in the Konopka home. However, the evidence does not support the conclusion that he necessarily lost blood in any quantity that would have dropped on the floor. More significantly, he argues, is that none of the victim's blood was identified as being on his clothes. O'Brien's father testified that when he observed his son at home at approximately 1:30 a.m. on June 6, 1984, he was asleep with a cigarette between his fingers and had no blood on him. However, the father had told the police officers on the day that O'Brien was arrested that when he saw O'Brien the night of Mrs. Konopka's murder, O'Brien was covered with blood. Furthermore, there was evidence that O'Brien had washed his clothes before the police arrested him and human blood was found on the tongues of O'Brien's new tennis shoes. That blood could not be eliminated as being his own or the blood of Mrs. Konopka. Thus, the jury could have disbelieved all of O'Brien's evidence or else reasonably believed that it was not inconsistent with his guilt.

We conclude that the jury could have found beyond a reasonable doubt that O'Brien was the person who murdered Mrs. Konopka.

O'Brien next contends the trial court erred in allowing the Commonwealth to recall O'Brien's father to lay a foundation for his impeachment. O'Brien's father testified that he saw his son at 1:30 a.m. on June 6, 1984, with no blood on him. After the defense rested, the Commonwealth moved to recall O'Brien's father to lay the foundation to impeach him by showing that, on the date O'Brien was arrested, his father told the police officers that O'Brien was covered with blood when he saw him at 1:30 a.m. The officer explained to the court that a decision had been made early in the investigation that the Commonwealth would not attempt to use the father's testimony to convict the son. However, when the father testified contrary to the statement he gave to the police at the time of his son's arrest, the Commonwealth's attorney stated that he did not recall having any knowledge of the father's earlier statement to the police. He informed the court that he learned of it just before making the motion to recall the father. The court accepted the Commonwealth's explanation and, over the defendant's objection, allowed the father to be recalled to lay the foundation for his impeachment.

"[T]he order of proof is a matter within the sound discretion of the trial court" to be reversed only in "very exceptional cases," and the trial court's rulings will be disturbed only if an abuse of that discretion affirmatively appears. *Hargraves v. Commonwealth*, 219 Va. 604, 608, 248 S.E.2d 814, 817 (1978) (citing *Mundy v. Commonwealth*, 161 Va. 1049, 1064, 171 S.E. 691, 696 (1933); *Flick v. Commonwealth*, 97 Va. 766, 774, 34 S.E. 39, 42 (1899)). As the Supreme Court held in *Savage v. Bowen*, 103 Va. 540, 544, 49 S.E. 668, 669 (1905), it is not an abuse of discretion for the trial court to allow a witness "to be recalled for the purpose of laying the foundation to contradict him, and afterwards permitting the introduction of witnesses to contradict him." Therefore, we hold that the trial court did not abuse its discretion in this case.

Finally, O'Brien argues that the trial judge erred in denying his request for disclosure of information concerning an accused burglar who was also suspected in the killing of Mrs. Konopka. The burglar was allegedly breaking into homes in the area during May

and June, 1984, the general time period of the murder, and his method of operation was similar to the one used by Mrs. Konopka's murderer.

It is clear that O'Brien's discovery request for information concerning the accused burglar who was initially suspected of killing Mrs. Konopka is not authorized by Rules of Court. Although the accused in a felony case is now allowed to inspect certain books, papers, documents, and other tangible objects within the possession, custody, or control of the Commonwealth, the items sought, nevertheless, must be "material to the preparation of his defense and . . . the request [must be] . . . reasonable." Rule 3A:11(b)(2). However, even if such a showing is made, this rule "does not authorize the discovery or inspection . . . of reports, memoranda or other internal Commonwealth documents made by agents in connection with the investigation or prosecution of the case," except for certain reports dealing with the accused himself or the victim in the case. *Id.*

O'Brien, however, did have a due process right to the disclosure of exculpatory evidence that was material either to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court set forth the standard of materiality applicable to non-disclosed exculpatory evidence:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682.

In this case, O'Brien claims that a man named Kemp had been indicted for nine burglaries, that the method of operation in these burglaries was similar to that of this case, and that one of the burglaries for which Kemp had been indicted occurred in the same neighborhood as the crime in this case. In one burglary, Kemp struck the resident and fled when he confronted the victim. O'Brien's counsel wanted to examine police notes on the burglary cases for which Kemp had been indicted.

Of the nine burglaries for which Kemp was charged, he only once confronted a resident of the home, striking that occupant in order to escape when he was discovered. He committed no murder. There was nothing alleged in the prior history of any of Kemp's crimes to compare with the nineteen brutal stab wounds Mrs. Konopka suffered in this case.

We conclude that there is no reasonable probability that the information sought concerning the Kemp burglaries would have altered the outcome of this case.

Accordingly, the judgment appealed from is affirmed.

*Affirmed.*

Baker, J., and Keenan, J., concurred.